[Crim. No. 6098. Fourth Dist., Div. Two. June 17, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN WAYNE DEAN, Defendant and Appellant.

## Counsel

Everett L. Spriggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and Karl J. Phaler, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**THE COURT.**—Defendant, his wife Gayle Dean,[1] and Michael Kimble were charged by information with kidnap for ransom (Pen. Code, § 209). Trial was by jury. Michael Kimble was found not guilty; defendant and his wife were found guilty as charged. It was also found that defendant

---

[1]The appeal of Gayle Dean is before the court in 4 Crim. 6148.

was armed with and used a pistol during commission of the offense. He was sentenced to state prison for the term prescribed by law.

## FACTS

Defendant was an employee of Rod's Packing Company in the Riverside area and in his capacity conversed with employees of Stater Brothers Markets learning that LaVoy Stater, retired chairman of the board of the market chain, was quite wealthy. Defendant decided to kidnap Mr. Stater's daughter, Ellen, for ransom, in order to attain financial independence. He assembled a variety of information concerning the activities of Ellen and eventually quit his job to devote full time to the kidnaping.

On February 9, 1973, Mr. and Mrs. Stater left their Riverside home at about 5 p.m., and their daughter, Ellen, also went out at that time. Ellen expected to return home before her parents.

After having dinner with a friend, Ellen Stater returned home about 9 p.m. While watching television in the den, the phone rang, and when Ellen answered it a man's voice asked for another girl. When Ellen stated she did not know who the girl was, the man asked to whom he was speaking. Ellen gave her name. When the man asked additional questions, she hung up. Fifteen minutes later the doorbell rang.

Ellen went to the door and opened it, leaving the chain on. Gayle Dean was on the doorstep, and asked Ellen for permission to go into the Stater's back yard to look for a dog which had supposedly gotten away from her. Ellen gave permission and closed the door, returning to her television program.

The doorbell rang again, and Ellen returned to the door and observed Mrs. Dean on her porch through the peephole. Ellen again opened the door, leaving the chain on, and Mrs. Dean asked if she could come in and use the telephone to call her husband to help her. Ellen let her in the house. Mrs. Dean dialed a phone number twice, stating to Ellen that she was receiving a busy signal, and on the third occasion engaged in a conversation.

While Mrs. Dean was on the phone she asked Ellen for the house address to give to her husband. Ellen provided it. Mrs. Dean, while awaiting her husband's arrival, engaged Ellen in conversation. She said she did not live very far away but was afraid to walk home at night.

Shortly thereafter the doorbell rang again and Ellen observed a man through the peephole. Mrs. Dean assured Ellen it was Mr. Dean. Ellen

opened the door. Ellen did not invite defendant into the house as he asked if he could come in for a drink of water. Ellen thought this strange since Mrs. Dean had said they did not live far away. Ellen attempted to close the door but defendant blocked it with his foot.

Defendant pushed his way into the house and pointed a gun at Ellen. The Deans left the house, taking Ellen with them at gunpoint. They got into defendant's car, with defendant in the driver's seat, Ellen in the middle, and Mrs. Dean on the passenger's side. They drove on the freeway for a while, and pulled off in the Ontario area, where Mrs. Dean took her husband's coat and covered Ellen's face with it so that Ellen could not see. They got back on the freeway and drove for at least three quarters of an hour, eventually arriving at a location which Ellen determined later was Burbank. Ellen was then taken to the Deans' house, informed that this was a kidnaping, and that a ransom was going to be requested.

Defendant told Ellen that it was a good thing she had not tried anything on the ride in from Riverside as Mrs. Dean had a gun on Ellen all the time. Ellen remained imprisoned in the Dean residence for several days, with her eyes taped and her hands tied. On Saturday, February 10, Mrs. Dean purchased a pair of handcuffs and defendant placed them on Ellen.

After Ellen's parents returned home and found that she was gone, her father received a phone call shortly after 2 a.m. and the caller informed him that Ellen had been kidnaped and he would be contacted later. Mr. Stater immediately called the Riverside police; the Federal Bureau of Investigation also entered the case. A surveillance was set up by the FBI in the early morning hours of February 13, 1973, of an area on the Ventura freeway in North Hollywood in the vicinity of the Lankershim off-ramp.

Michael Kimble received a telephone call from defendant on Sunday, February 11, 1973, following which defendant came over to Kimble's house and offered Kimble a job driving a car for an hour or an hour and a half on Monday night for which Kimble would be paid $5,000. Kimble accepted the offer. Defendant picked up Kimble at 7 p.m. on February 12 and the two drove to Riverside where defendant made some telephone calls.

Defendant and Kimble then returned to Los Angeles and defendant showed Kimble where Kimble was supposed to let him out of the car just before the Lankershim off-ramp on the Ventura freeway. More telephone calls were made by defendant in the Burbank area. Then defendant had Kimble drop him off at the area previously designated. Kimble

returned in 10 or 15 minutes but defendant was not waiting for him when he returned the first time. Kimble circled around and passed by the area again. On the second pass a car pulled out behind Kimble, who kept driving. He was eventually stopped and placed under arrest by the occupants of the car following him, who were FBI agents.

Early in the morning of February 13, FBI Special Agent Krahling was conducting a surveillance at Denny Avenue near the Lankershim off-ramp on the Ventura freeway in North Hollywood, after having received information that Mr. Stater was to await a call at a telephone booth in the area and would then be advised as to the ransom transfer location. Agent Krahling and his partner, Agent Chefalo, felt from past experience that this was a likely place for the ransom transfer. At this time the agents did not know where the kidnap victim was, or whether she was dead or alive. They had no information about her physical well-being.

After having received word that the drop was to be on the north side of the Ventura freeway, Agent Krahling entered the bushes in the area, but before the package was dropped off he encountered defendant in the bushes. Defendant was crouched behind some foliage with a silver-colored pistol in his right hand and a pair of leather work gloves at his feet. Agent Krahling pointed a shotgun at defendant and ordered him to throw down his gun. Agent Krahling then put the shotgun down, drew his service revolver, and had defendant lie on the ground while he was handcuffed. Agent Krahling then holstered his service revolver and, out of concern for the whereabouts and safety of the kidnap victim, asked defendant where she was. Defendant told him she was in Burbank at a specified address. No promises or threats were made to defendant to elicit this information. Not knowing whether or not defendant was telling the truth, Agent Krahling asked whether defendant's car was nearby, with the thought in mind that Ellen might be in the car. Defendant replied that he did not have a car, and then told the agent that he was going to be picked up by a person driving a Plymouth Gold Duster. When Agent Krahling and defendant met Agent Chefalo a few moments later, the latter also asked defendant about a vehicle and defendant again advised that he was to be picked up by a Plymouth Gold Duster with a partial license number of FUQ. Again, no promises or threats were made to defendant.

Defendant was taken to the Los Angeles FBI office where he was advised of his rights, indicated that he understood, and told the agents of his role in the kidnaping. Defendant also told the agents where his wife was located. She was apprehended by several FBI agents. Another agent went to the Dean home and there found Ellen Stater handcuffed to a bed. Defendant did not testify at trial.

## DISCUSSION

■ The instant controversy concerns whether the rescue doctrine of *People* v. *Modesto*, 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], remains valid in light of the decision in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

On February 11, 1965, the California Supreme Court filed its decision in *Modesto*. It is unnecessary to repeat the grisly facts of that case. A 9-year-old girl had been found dead and her 12-year-old sister missing. Defendant was arrested for suspicion of murder and questioned by the police until he disclosed the location of the missing girl. At that time defendant had not been advised of his right to counsel or to remain silent.

The court held: "The statements made by defendant before Connie's body was discovered are admissible. They were freely and voluntarily made at a time when the officers were concerned primarily with the possibility of saving Connie's life. The paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel. Since these statements were voluntarily made and lawfully obtained, there is no basis for their exclusion. (See *People* v. *Roberts*, 47 Cal.2d 374, 379 [303 P.2d 721].) It is true that in *Massiah* v. *United States*, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], the United States Supreme Court held that incriminating statements surreptitiously obtained from an indicted defendant who had been released on bail could not be used against him at his trial even though the court assumed the statements were lawfully obtained in the course of a continuing police investigation of crime. In the *Massiah* case, however, no compelling emergency was present, and the continuing investigation of other crimes could reasonably be segregated from the proof of the crime for which the defendant had been indicted. In the present case the officers' investigatory and rescue operations were necessarily inextricably interwoven until Connie's body was found, and it would be needlessly restrictive to exclude any evidence lawfully obtained during the rescue operations. Under these circumstances we do not believe that the *Massiah* case is controlling." (*People* v. *Modesto, supra*, 62 Cal.2d 436, 446-447.)

*Miranda*, of course, involved police interrogation to obtain a confession (*Miranda* v. *Arizona, supra*, 384 U.S. 436, 439 [16 L.Ed.2d 694, 704, 86 S.Ct. 1602] and the rule evolved was to protect the constitutional rights of the individual "against overzealous police practices." (384 U.S. 436, 444-460 [16 L.Ed.2d 694, 706-715, 86 S.Ct. 1602].) The evils

*Miranda* sought to avoid are well known. (See 384 U.S. 436, 445-460 [16 L.Ed.2d 694, 707-715].) The majority opinion gives no guide to what officers should do when confronted with a balancing between the life of a victim and protection of a suspect's constitutional rights.

*Miranda* postdated *Modesto,* being decided 16 months later on June 13, 1966. The rapid conclusion, though ill advised, would be that *Miranda* vitiated the quoted rule from *Modesto.* However, prior to *Miranda* and *Modesto* was the decision in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361] (decided Jan. 29, 1965) which came very near the *Miranda* decision in substance. As a consequence it becomes more difficult to assume the *Modesto* rule would have been different if rendered subsequent to *Miranda,* the *Modesto* court only 13 days earlier having filed its *Dorado* decision. Furthermore, the court rendered its decision in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], on March 25, 1965, which reversed the defendant's conviction on the basis of *Dorado. Stewart* was one of the four consolidated cases under the general title *Miranda* v. *Arizona,* and the decision of the California Supreme Court was affirmed. (384 U.S. 436, 498 [16 L.Ed.2d 694, 737, 86 S.Ct. 1602].) We are convinced that the *Modesto* rule was not formulated in a vacuum which did not recognize the *Miranda* considerations.

*Miranda,* of course, does not require the recitation of the enumerated warnings each time a citizen and officer come into contact. That court advised that its "decision is not intended to hamper the traditional function of police officers in investigating crime. [Citation omitted.] When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. [Fn. omitted.]" (*Miranda v. Arizona, supra,* 384 U.S. 436, 477-478 [16 L.Ed.2d 694, 725-726, 86 S.Ct. 1602].)

Also, the *Miranda* court clarified that "[t]here is no requirement that police stop a person who enters a police station and states that he wishes to confess a crime, [fn. omitted] or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admis-

sibility is not affected by our holding today." (384 U.S. 436, 478 [16 L.Ed. 2d 694, 726, 86 S.Ct. 1602].)

Another *Miranda* exception is found in *People* v. *Terry,* 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961], where the Supreme Court approved the conduct of the police in asking the defendant, upon arrest, his name and address without first giving the *Miranda* admonitions. (2 Cal.3d at pp. 382-383.)

*Miranda,* with eloquence, recites essentially that the reasons behind its decision go to the very foundation of our government and the dignity and integrity of our citizenry. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 460 [16 L.Ed.2d 694, 715, 86 S.Ct. 1602].) It would seem to this court that even more basic than the right of a citizen not to be compelled to incriminate himself is the right of a citizen to his *life.* To this end law enforcement must be ever vigilant for without this underlying paramount consideration, there is no point to the system itself.

It is difficult to perceive *Miranda* as allowing questions concerning name and address but attaching all the formalities to questions concerning the whereabouts and health of a kidnaping victim. While life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent. It is inconceivable that the *Miranda* court or the framers of the Constitution envisioned such admonishments first be given under the facts presented to us. While we do not countenance the rubber hose to obtain the answers, we see no wrong in asking the type of questions found herein.

The easy answer is to decide that the police are under a duty to ask questions concerning the location of the victim but that none of the defendant's answers may be used against him in a court of law. This would seem to protect both the victim and the accused. What about the "fruit of the poisonous tree" doctrine? Its application could well free the accused and basic justice would be wanting.

While a premium must be placed on rescue of the victim, this must not occur in a setting that will merely turn the criminal loose again to work his evil upon others. The kidnaper must be stopped and the victim saved. This is the thrust of the *Modesto* decision which we believe to be still fully vital law. (See *People* v. *Modesto, supra,* 62 Cal.2d 436, 446.)

One California case has relied on the *Modesto* rescue doctrine since the *Miranda* decision. In *People* v. *Miller,* 71 Cal.2d 459 [78 Cal.Rptr. 449, 455 P.2d 377], the police questioned defendant because he was the last one seen with a missing eight-year-old child. At the time of questioning,

the police may have been suspicious but they were then merely following up a missing persons report and had no intent to nor did they arrest defendant at that time. Defendant was arrested seven and one-half hours later. The court found that the situation was merely general on-the-scene questioning and concluded that the "paramount interest in locating the child justified the officers in not impeding their efforts by informing defendant of his right to remain silent and to the assistance of counsel." (71 Cal.2d at p. 482.)

In *People* v. *Jacobson* [Sept. 17, 1965], 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], the *Modesto* rescue doctrine was followed. (63 Cal. 2d at p. 328.) Mr. Justice Peters in his dissent argued as follows: "The majority are also incorrect in their discussion of the applicability of the *Modesto* rule in connection with the interrogation by Officer LeBlanc. The majority hold that there was a paramount interest in possibly saving the child's life, but a reading of the transcript reveals no such intent on the part of the officer and no such emergency as was presented in *Modesto*. In that case the police had good reason to believe that the continued interrogation of the suspect might save the girl's life. There is no such showing in the present case.[1]" (*People* v. *Jacobson, supra,* 63 Cal.2d 319, 340.)

"[1]Perhaps the majority are holding that so long as the victim has not been found there is, as a matter of law, a paramount interest in attempting to save the victim's life. There is no basis for such a broad reading of the *Modesto* holding. The paramount interest ought to be, in an appropriate case, one of the factual determinations made as part of the foundation to the introduction of a confession. There appears to be no good reason to formulate a rule that, as a matter of law, any time the police have not yet found the victim's body the police may interrogate the suspect, and certainly not in a case where they had been told the victim was dead." (*People* v. *Jacobson, supra,* 63 Cal.2d 319, 340, fn. 1.)

There is some persuasion in Mr. Justice Peters' argument that there must be a reasonable belief that the victim *may* still be alive and that in questioning the defendant the intent of the officers must be to save the victim's life.

While it is sadly true that all kidnap victims are not found alive, this does not compel the conclusion that a belief rescue is possible is unreasonable. A consideration frequently will be that accomplices of the captured kidnaper may be under instruction to kill the victim if the compatriot has not returned within a specified period of time. Maybe the victim is then dying or stuffed in a vehicle trunk which might not be discovered for

days or weeks. Such considerations strongly support the rescue doctrine of *Modesto.*

Special Agent Krahling testified that at the time he did not know whether the victim was dead or alive, let alone her location. He did not know how many kidnapers were involved. He was concerned for her safety and immediately after handcuffing defendant "asked him or blurted out the question, where is the girl?" Defendant responded that the victim was "okay and she is in Burbank. She is unharmed. She is tied up." Krahling did not give the *Miranda* warnings because he "was only concerned with the girl's safety and her whereabouts and it really never entered [his] mind."

Krahling responded asking for more specificity and defendant gave him the street address where the victim was. Not knowing whether defendant was telling the truth and thinking the victim might be in defendant's car, he asked the location of defendant's car. Defendant responded that his partner was picking him up above the freeway underpass.

Krahling then took defendant out of the brush to the freeway embankment where Agent Chefalo was encountered. Not knowing of the disclosures to Krahling, Chefalo asked defendant the same questions and elicited that defendant was to be picked up in a Plymouth Gold Duster bearing the license plate letters FUQ. Chefalo was concerned the victim might be in that vehicle.

Both Krahling and Chefalo testified they made no promises to defendant nor did they threaten him in any way. Both believed defendant's statements to be free and voluntary. Of course defendant had been subdued and disarmed at the point of a shotgun and was handcuffed. This, however, does not reduce defendant's statements to an involuntary level as a matter of law. The criticisms of Mr. Justice Peters in *Jacobson* are not here present.

Looking to the totality of the facts before us, it is clear the evils *Miranda* sought to alleviate are not involved. The questioning was spontaneous upon apprehending defendant and the sole motivation to rescue the victim. The answers were not obtained through coercion and not sought for the purpose of obtaining a confession—they were free and voluntary. The rescue of the victim was of paramount importance and the rule formulated in *Modesto* remains a vital rule of law in this state. Both the timing of the *Modesto* decision in light of *Dorado* and *Stewart* and the post-*Miranda* application of the rescue doctrine in *Miller* supports our conclusion, as does a mere weighing of the Fifth Amendment rights against the right to life.

In addition, we observe that the *Modesto* rescue doctrine is not anoma-

lous in the law. Similar is the emergency or "exigencies of the situation" doctrine developed under the Fourth Amendment.

"[T]he emergency doctrine exists in situations in which there is a substantial threat to life, health or property. Under such circumstances, the officer is excused from ordinary Fourth Amendment restrictions because he is acting to save life or property." (*Carrington* v. *Superior Court,* 31 Cal.App.3d 635, 639 [107 Cal.Rptr. 546].)

The emergency doctrine was applied in *Warden* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642] to justify a police entry into a residence without a warrant and introduction into evidence of certain clothing discovered while looking for a weapon or contraband. Hayden robbed a taxicab company and two cab drivers followed him and observed his entrance into a particular residence. This was radioed to the police who arrived within minutes and entered the residence without a warrant. The court held that the police "acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." (*Warden* v. *Hayden, supra,* 387 U.S. 294, 298, 299 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642].) Thus the emergency doctrine operated to excuse the officers from compliance with the Fourth Amendment because compliance would have gravely endangered their lives or the lives of others.

Our state Supreme Court applied the doctrine in *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721]. There officers were investigating a burglary which led them to a particular apartment. The manager advised them a woman and a sickly man resided in the apartment. The officers knocked on the door but there was no response. They then heard "several moans or groans that sounded as if a person in the apartment were in distress." They entered for the purpose of rendering aid but instead of discovering an ailing person inside discovered burglary contraband in plain view. The court in upholding the action of the officers and the admissibility of the evidence discovered observed that "[n]ecessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose." (47 Cal.2d at p. 377.) The *Roberts* case

was cited by the *Modesto* court in articulating the rescue doctrine exception to the Fifth Amendment.

The emergency doctrine was also followed in *People* v. *Sirhan,* 7 Cal. 3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121], where immediate search was necessary because of the possibility of the existence of a conspiracy to assassinate political leaders. (7 Cal.3d at pp. 737-740; see also *Carrington* v. *Superior Court, supra,* 31 Cal.App.3d 635, and cases cited therein at pp. 639-640.)

The Fourth Amendment emergency doctrine has been applied for the purpose of protection of life. Where the preservation of life is at stake and consists of the sole motivating force behind the conduct of the officers, which conduct is reasonable under the circumstances, there is no rational basis to distinguish the protections of the Fifth Amendment from the protections of the Fourth Amendment. In either case the issue is that of saving a life. For all practical purposes, the rescue doctrine under the Fifth Amendment and the emergency doctrine under the Fourth Amendment are one and the same to the extent they operate to protect life.

In view of our decision, we need not consider defendant's remaining contention that his subsequent confession after *Miranda* warnings were given and waived was tainted by his admissions at the time of capture.

Judgment affirmed.