[Crim. No. 34649. Second Dist., Div. Four. Apr. 10, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN THOMAS WILLIS, Defendant and Appellant.

COUNSEL

Joseph Shemaria, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Vincent J. O'Neill, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

JEFFERSON (Bernard), J.*—By information, defendant was charged in count I with the murder of Rachel Sparling, in violation of Penal Code

*Assigned by the Chairperson of the Judicial Council.

section 187. It was further alleged that, in the commission of this offense, defendant had used a firearm within the meaning of Penal Code section 12022.5.

In count II, defendant was charged with kidnaping Rachel Sparling for robbery in violation of Penal Code section 209. It was further alleged that, in the commission of this offense, defendant, with the intent to inflict such injury, had inflicted great bodily injury upon the victim within the meaning of Penal Code section 12022.7. In count III, defendant was charged with robbery of Rachel Sparling in violation of Penal Code section 211. It was further alleged that, in the commission of this offense, defendant had used a firearm within the meaning of Penal Code section 12022.5, and, with the intent to inflict such injury, had inflicted great bodily injury upon the victim.

Defendant entered a plea of not guilty and denied the additional allegations made in the three counts.

Defendant's motion for a change of superior court district venue because of pretrial publicity was denied. His motion to suppress evidence, made pursuant to Penal Code section 1538.5, was denied, but his motion was granted to suppress certain postarrest statements made to the police. At trial, however, the court reconsidered the matter of suppression of the statements and admitted them into evidence. Defendant's motion to suppress photographic identification of him by certain witnesses was denied.

Trial was by jury. Defendant was found guilty as charged in all three counts. The murder and the robbery were found to have been of the first degree. The firearm use and great bodily injury allegations were also found to be true.

Defendant's motion for a new trial was denied, as was his application for probation. Defendant was sentenced to the term prescribed by law on each count, each term being enhanced pursuant to the additional allegations found true by the jury. The sentences on counts I and II were ordered to run consecutively. The sentence imposed on count III was ordered merged with that of count I. Defendant was credited with presentence time in custody. He appeals from the judgment of conviction.

I

*The Crimes*

On March 14, 1977, Rachel Sparling, the wife of Darel Sparling and the mother of four daughters, left her husband's place of business in Santa Ana, California at midday. Her destination was the Pasadena office of her psychiatrist, Dr. Alan Karme, located near the Huntington Hospital, where she had a 2:30 p.m. appointment.

Rachel was in good spirits, according to her husband. She was driving a bronze Corvette automobile he had given her for her birthday, a car carrying a personalized license plate, "WUV YOU." She was wearing a watch, various rings, an Aztec medallion and was carrying a set of keys. Rachel arrived at Dr. Karme's office and parked the Corvette in the adjacent hospital parking lot. She and Dr. Karme completed their session and Rachel left his office about 3:45 p.m. Dr. Karme had also found her to be in a positive mood.

Rachel Sparling then disappeared. From the evening of March 14, 1977, forward, there were intensive efforts by various police agencies to investigate her disappearance and discover her whereabouts.

On March 18, 1977, several days after her disappearance, her body was discovered near a turnout in the highway in the mountains above nearby Glendale. It had been laid out on its back, hands on the abdomen, feet together; there were bullet wounds in the head. Some distance away, two yucca leaves had been arranged in the form of a cross. Three spent shell casings were subsequently found in the area. The autopsy revealed that the cause of death was two gunshot wounds to the head, each potentially fatal within an hour of infliction. One bullet was removed from the brain. The deputy medical examiner concluded that death had occurred more than 24 hours before discovery of the body.

II

*Events Leading to Defendant's Arrest and*
*His Connection With the Crimes*

In January 1977, defendant, then aged 16, was staying with a couple in Utah, the Bluths, in their trailer. Mr. Bluth kept a .25 caliber Colt automatic pistol there, subsequently discovered by him to be missing.

While defendant was in Utah, he kept in contact by telephone and letter with two friends in Los Angeles, teenaged girls named Robyn Evans and Sunie Volk. Defendant mentioned to Sunie that he had a gun and that no one had better bother him.

On March 6, 1977, one day before his seventeenth birthday, defendant returned to Los Angeles and stayed at the home of Robyn. He showed her a gun, and gave her a bullet.

On March 9, 1977, defendant's father, Donald Willis, arranged for defendant to stay at 900 Monterey Road, South Pasadena. Donald Willis visited defendant at this location and observed some spent shell casings on the premises. On March 10, 1977, defendant visited his father, who was employed at the Huntington Hospital in Pasadena.

On March 14, 1977, the date of Rachel Sparling's disappearance, various witnesses saw defendant loitering about the Huntington Hospital—in the pharmacy and the parking lot—and he was also seen in the medical building across the street where Dr. Karme, the victim's psychiatrist, had his offices.

Rachel Sparling left that location at approximately 3:45 p.m. Thereafter, witnesses saw the Corvette at various locations in the Pasadena area; at 4 p.m., the car was seen with a woman driver and a young male passenger; after 4:30 p.m. it was seen on the highway above Glendale, parked at a turnout; and later it was seen being driven by a male, the sole occupant of the car.

Around 6 p.m., on March 14, defendant arrived at the home of his friend Robyn Evans in Van Nuys, driving the Corvette, which he stated belonged to his aunt. Defendant and Robyn then drove to the home of Sunie Volk in Granada Hills. Defendant took Sunie for a ride around the block, lost control of the wheel of the Corvette, and struck a parked and unoccupied car. Sunie fled from the scene of the accident, while defendant drove the Corvette away. Eventually, both returned to the Volk residence, where defendant hid when the police arrived there to investigate the accident. Later that evening defendant was transported back to the Evans residence by Robyn's mother. There he gave Robyn more bullets; she turned them all over to the police the following day. Defendant then called his father, who picked him up and took him to the Monterey Road residence where he left defendant after midnight.

The intensive police investigation—which we referred to previously
—led to defendant's arrest in the early morning hours of March 15,
1977. It also led to the seizure by the police of certain personal property
belonging to Rachel Sparling, found at 900 Monterey Road, and to a
tape-recorded interview between Pasadena police officers and defendant
at approximately 8 a.m. on March 15, 1977, (admitted into evidence at
trial) containing some damaging admissions by defendant. A ballistics
expert, Warner, test fired a handgun discovered in the Corvette after
defendant had abandoned the vehicle in Granada Hills; Warner com-
pared the casings and projectiles thus produced with those found near
the victim's body, and also the projectile jacket removed from the vic-
tim's brain. Warner concluded that all had been fired from the same
weapon, the .25 caliber handgun.

Defendant did not testify at trial, nor did he present any affirmative
defense. We turn now to the contentions made by defendant on this
appeal.

## III

### *The Motion to Suppress the*
### *Material Objects Evidence*

Defendant contends that his motion to suppress the evidence obtained
at 900 Monterey Road was improperly denied because his arrest was il-
legal, a violation not only of former Welfare and Institutions Code
section 625.1, but of the legal principles set forth by the Supreme Court
in *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d
1333]. We now summarize the pertinent evidence presented at the hear-
ing on defendant's Penal Code section 1538.5 suppression-of-evidence
hearing.

At about 8:30 p.m. on March 14, 1977, a Los Angeles Police Depart-
ment accident investigator named Bonner was summoned to Granada
Hills to investigate a hit and run accident. A parked and unoccupied ve-
hicle had been struck by a Corvette carrying a personalized license
plate, "WUV YOU." Officer Bonner found the Corvette approximately a
block from the accident scene; it was illegally parked and unoccupied.
Bonner also found in the Corvette a loaded .25 caliber automatic pistol
and a woman's purse which contained identification in the name of
Rachel Sparling.

Defendant's teenaged friend, Sunie Volk, came to the accident scene and told Officer Bonner she had been a passenger in the Corvette when it struck the parked car; that she had initially fled, but had returned. Sunie told Bonner that Brian Willis (defendant herein) had been driving the Corvette and had driven it away after the accident. Sunie also told Bonner that defendant was supposed to be residing at "Pride House," a residence in Van Nuys for individuals on probation. According to Sunie, defendant had told her the Corvette belonged to his cousin and that he was in the process of buying it. Bonner was given the telephone number of defendant's girlfriend, Robyn Evans, by Sunie.

Officer Bonner became concerned about the present whereabouts of Rachel Sparling, the owner of the purse. He called Darel Sparling, Rachel's husband, and Darel expressed concern because Rachel had been expected home in El Toro, California at 6 p.m., and had not yet arrived. Darel Sparling also stated that no one but immediate family members had permission to drive Rachel's Corvette. Bonner then spoke to Dr. Karme, who told him Rachel had left his office sometime after 3 p.m. that afternoon. Bonner related the information he had gathered to his watch commander, Sergeant Coe, and continued to investigate. A record check revealed that a Brian Willis was missing from "Pride House," having been placed there after involvement in a robbery, and that he had a father who resided in the Pasadena area.

Sergeant Coe joined the investigation and learned that defendant had been picked up at Robyn Evan's residence that evening by his father, Donald Willis. At about 1:30 a.m. on March 15, 1977, Sergeant Coe contacted the South Pasadena Police Department watch commander, Sergeant Terpinitz and advised him of the situation, including the fact that Rachel Sparling was missing; he requested that defendant be taken into custody.

Sergeant Terpinitz and other police officers immediately went to the South Pasadena address of Donald Willis. Willis was advised that the officers wished to detain defendant; that defendant was a runaway; that he had been involved in a hit and run accident; and that there was some suspicion of foul play. Defendant's father told the officers he did not know the address of the house where his son was staying, but that he would take the officers there. The father explained that the house in which defendant was staying was owned by a friend and that the father had arranged for defendant to stay there during some remodeling the owner was undertaking; defendant was to assist with the work. Donald

Willis, defendant's father, took the officers to 900 Monterey Road, South Pasadena.

Donald Willis entered the residence, which was not locked, followed by Officers Brown and Simpson, who were in uniform. The father proceeded directly to a bedroom. Defendant was there, lying on a bed; he identified himself. In plain view, hung on a bedpost, was a lady's wristwatch. On the inside doorknob hung a ring of keys, also in plain view. Defendant was arrested and the items seen by the officers were seized by them. Sergeant Terpinitz then searched the house, looking for Rachel Sparling.

After being taken outside, defendant was advised of his constitutional rights with respect to custodial interrogation, as set forth in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], including the right to be silent and the right to the assistance of counsel. Defendant refused to waive his *Miranda* rights. He was booked into the South Pasadena police station at about 2:20 a.m., and was given the opportunity to make two telephone calls. Defendant remained at the station until 8 a.m. and was at times in a holding cell, or, handcuffed, at large in either the booking area, the report writing area, or the coffee room of the police station. During this period, he neither ate nor slept, although no effort was made to prevent him from doing either.

Meanwhile, the police continued their investigation. In the early morning hours, Pasadena Police Sergeants Hester and McCray were advised of the situation and met with South Pasadena Officer Simpson at 900 Monterey Road. The residence was thoroughly searched in an effort to find clues concerning Rachel Sparling. Sunie had told the police that defendant was wearing a black jacket on March 14, 1977. In the bedroom where defendant had been arrested, the police found a black jacket, and in a pocket were four rings. The searching officers also found considerable ammunition on the premises, some of which was suitable for use in a .25 caliber gun.

The suppression-of-evidence motion made by defendant was directed toward all of the property items found in the house and on the defendant's person at the time of his arrest. The watch, the keys and the rings were identified as the property of Rachel Sparling. Further search of the back seat of the Corvette disclosed the Aztec medallion which Rachel had been wearing on March 14, 1977.

## A. The Applicability of Welfare and Institutions Code Section 625.1

█ Defendant contends that his arrest was illegal because it was effected without a warrant as required by then operational section 625.1 of the Welfare and Institutions Code, and, hence, that evidence seized in conjunction with the entry into the Monterey Road residence and the subsequent arrest should have been suppressed.

Welfare and Institutions Code section 625.1, as enacted in 1971, listed the circumstances under which a peace officer could arrest a person under the age of 18 without a warrant. The pertinent provision with which we are concerned authorized a warrantless arrest "[w]henever the officer has reasonable cause to believe that the minor has committed a public offense *in his presence.*" (Italics added.) Section 625.1 was interpreted by the California Supreme Court in *In re Thierry S.* (1977) 19 Cal.3d 727, 744-745 [139 Cal.Rptr. 708, 566 P.2d 610], as precluding a warrantless arrest of a minor by a police officer for a misdemeanor *not* committed in the officer's presence.[1]

Defendant's contention relative to the violation of section 625.1 as a ground for his suppression-of-evidence motion, was not made below but has been raised here for the first time. It was pointed out in *People v. Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048], that "the general rule [is] that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citations.] The contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' [Citation.]" (Accord, *People v. Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919].)[2] In view of this recently reiterated rule of appellate review, we consider that we are precluded from considering any arguments addressed to the applicability of Welfare and Institutions Code section 625.1.

---

[1] Section 625.1 of the Welfare and Institutions Code was repealed in 1978 (Stats. 1978, ch. 1372, § 1) but we agree that it applied to defendant on March 15, 1977.

[2] We note that it is not at all clear that section 625.1 would have been found to be the applicable statute had it been appropriately raised at the suppression hearing. Section 625, subdivision (b), of the Welfare and Institutions Code provides for the warrantless

## B. *The Ramey Doctrine*

In *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333], the California Supreme Court declared that "the protection of article I, section 13, of the California Constitution and the Fourth Amendment of the federal Constitution against violation of the right of the people to be secure in their persons and houses against unreasonable seizures applies to arrests within the home, and that warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances." Defendant asserts that his warrantless arrest on March 15, 1977, at the Monterey Road residence was a violation of the constitutional protection pronounced in *Ramey*, and was thus an illegal arrest.

In *People* v. *Escudero* (1979) 23 Cal.3d 800, 807 [153 Cal.Rptr. 825, 592 P.2d 312], it was made clear that, for *Ramey* purposes, "home" should be defined in terms "as broad as necessary to protect the privacy interests at stake" and, therefore, would include any premises in which the occupant had acquired "a legitimate expectation of privacy." ▪ It follows that defendant's occupancy of the premises at 900 Monterey Road, no matter how temporary or how casually undertaken, was constitutionally protected from police intrusion and warrantless arrest, unless an exception to the application of *Ramey* principles was appropriate. The *Ramey* court specifically held that the stated principles were applicable in "the absence of a bona fide emergency, or consent to enter,..." (*Ramey, supra*, 16 Cal.3d 263, 275.)[3]

---

arrest of a minor "when such officer has reasonable cause for believing that person has violated an order of the juvenile court or has escaped from any commitment ordered by the juvenile court,..." In addition, the trial court may well have found the "rescue doctrine" or "exigent circumstances" as expressions of law overriding the general section 625.1. These expressions of law will be discussed later in this opinion. Also, it is to be noted that a failure of trial counsel to address an issue below may be urged on appeal as an indication of ineffective assistance of counsel—a deprivation of defendant's constitutional rights.

[3]With respect to the matter of "consent" in the case at bench, Donald Willis, defendant's father, had arranged for his son's residence at 900 Monterey Road pursuant to the senior Willis' agreement with the owner of that property. It was stated in *In re Scott K.* (1979) 24 Cal.3d 395, 404 [155 Cal.Rptr. 671, 595 P.2d 105], that "[a] warrantless search is reasonable when consent is granted by one who has a protectible interest in the property. Valid consent may come from the sole owner of property or from 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" We perceive no "requisite link" between the premises involved in the case at bench and any interest of Donald Willis. Thus Willis could not consent to the intrusion of police officers there for the purpose of making the warrantless arrest.

The "exigent circumstances" which would justify a warrantless arrest within the home were defined in *Ramey* as "an emergency situation requiring swift action to prevent *imminent danger to life* or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*Ramey, supra*, 16 Cal.3d 263, 276.) (Italics added.)

As in cases involving the determination of the existence of "probable cause," we assess the "specific and articulable facts" known to the officers who accompanied Donald Willis to 900 Monterey Road. (*People v. Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].) The prosecution established the fact that all the known information which had been gathered concerning the disappearance of Rachel Sparling under suspicious circumstances had been relayed from the various investigating officers to each other on the evening of March 14, 1977. The officers sent to arrest defendant knew that Rachel Sparling was many hours overdue at her home; that she had disappeared less than 12 hours before; that her purse and a loaded gun had been found in her car after her disappearance; that defendant had been driving her car and it appeared that his use thereof was nonpermissive; that defendant had misrepresented his possession of the vehicle to others; that defendant had abandoned the car and had fled after a minor accident; and that defendant had previously been involved in a robbery and was a runaway from probation placement.

Of considerable importance, too, was the fact that the investigating officers in reality had no other leads to the location of Rachel Sparling but those which might be furnished by defendant. The officers, based upon what they knew, had reason to feel considerable apprehension for Rachel Sparling's wellbeing. They may well have felt, as they testified they did, that there was "imminent danger to life" inherent in the situation. The passage of time was obviously a crucial element; the disappearance of the victim was fairly recent but the necessity for locating her became more acute as hours passed without communication from her. On the basis of the particular circumstances developed here, we hold that the trial court was correct in determining that the "exigent circumstances" exception of *Ramey* applied to defendant's warrantless arrest, and that there was no violation of the legal principles set forth in *Ramey*. The arrest and search were lawful.

IV

## The Admissibility of the Postarrest Statements

Defendant advances the contention that his postarrest statements, made to the Pasadena police on the morning of March 15, 1977, and which were tape recorded and later presented to the jury, should have been excluded from evidence as "involuntary" statements.

We summarize the evidence presented below on this issue. At 8 a.m. on March 15, 1977, defendant was turned over by the South Pasadena police to the Pasadena police, and was transported to Pasadena city jail, where he was to be rebooked for grand theft auto, because Darel Sparling had filed a stolen car report concerning the Corvette.

The Pasadena officers were aware that defendant was only 17 years of age, a minor, and that he had previously refused to waive his rights against self-incrimination as set forth in *Miranda, supra,* 384 U.S. 436. Pasadena Police Sergeant Hester, however, again advised defendant of his *Miranda* rights and desired to interrogate defendant in the hope that he might obtain from defendant some new information about Rachel Sparling, whom he thought might be alive and in need of assistance.

Defendant waived his rights and agreed to talk. Defendant admitted taking the Corvette from the hospital parking lot. He claimed that the woman driver of the Corvette had left the car while the motor was running, and had departed toward a nearby building; defendant stated that this was the last time he saw her; he said he had driven the Corvette away and, some hours later, had been involved in the accident in Granada Hills. Defendant made no meaningful response to Sergeant Hester's attempt to appeal to him by stating that the lady's life might be saved if she was hurt and needed immediate attention. In substance, defendant denied knowing the victim's present whereabouts or that he had harmed her.

■ It is elementary that, before the admissions or confessions of a custodial suspect to the police may be admitted into evidence, the burden is on the prosecution to establish that they were obtained voluntarily, without violating the suspect's constitutional protection from coerced self-incrimination. The opportunity to choose either to be silent or to talk to the police is a constitutional mandate, the rationale

for which is set forth in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and needs no further amplification here.

At issue in the case at bench is the oft-repeated principle contained in *Miranda*: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease.*" (*Miranda, supra,* 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723].) (Italics added.) It is uncontroverted that defendant invoked his *Miranda* rights shortly after arrest, and that this fact was known to the Pasadena authorities when they took custody of him the following morning but renewed interrogation by again advising him of his *Miranda* rights, at which time defendant waived his *Miranda* rights and submitted to interrogation.

■ There have been numerous California Supreme Court opinions setting forth the *Miranda* principle that once the right against self-incrimination is invoked the police may not attempt to renew interrogation. (See *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) This legal rule applies even when the subsequent interrogation is undertaken, as it was here, by police authority in another jurisdiction. (*People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108].) The burden on the prosecution of establishing a knowing and intelligent waiver by a suspect of his right not to incriminate himself is a heavy one. (*People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384].) At issue here, then, is whether the "exigent circumstances," discussed previously herein, provide justification on the part of the Pasadena police officers in attempting to renew interrogation of the defendant by again advising him of his *Miranda* rights.

■ Reliance is placed by the prosecution on the "rescue doctrine"—a doctrine recognized in California in *People* v. *Modesto* (1965) 62 Cal.2d 436, 446-447 [42 Cal.Rptr. 417, 398 P.2d 753], decided prior to the *Miranda* decision of 1966. The doctrine is a particular species of "exigent circumstances." Simply stated, the "rescue doctrine" is to the effect that, where the interrogation of a suspect is undertaken by the police for the paramount reason that information is being sought to save a life, the interrogating officers are justified in "not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel." (*Modesto, supra,* 62

Cal.2d 436, 446.) The interest in saving a human life is considered to be outside of the parameters of the constitutional protection afforded against self-incrimination.

After *Miranda*, the "rescue doctrine" was reexamined in *People v. Dean* (1974) 39 Cal.App.3d 875 [114 Cal.Rptr. 555]; the *Dean* court found the doctrine to be still viable. In *Dean*, a defendant had planned and was executing the kidnaping of a victim for purposes of ransom. He was taken into custody by FBI agents at the location where the ransom was to be paid. The victim's present whereabouts was of paramount concern to the arresting officers; without advising defendant of his rights, the officers asked him where the victim was, and he told them. The *Dean* court held the defendant's statements to be admissible pursuant to *Modesto*, declaring that "[w]hile life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." (*Dean, supra,* 39 Cal.App.3d 875, 882.) It was further held that the determination was not inconsistent with *Miranda*; that the evils of third degree interrogation that *Miranda* sought to alleviate were not present in the case at bench.

More recently, in *People v. Riddle* (1978) 83 Cal.App.3d 563 [148 Cal.Rptr. 170], the pregnant wife of a Los Angeles attorney had disappeared from her home under suspicious circumstances. Defendant therein was almost immediately identified as a suspect, was taken into custody and given *Miranda* warnings; when asked repeatedly where the victim was, defendant was silent at first but renewed interrogation, conducted over a period of several days, finally produced some incriminating information about where the body of the victim could be found. The *Riddle* opinion analyzed the "rescue doctrine" in the context of *Miranda*, noting that "[t]he most pressing emergency of all is rescue of human life when time is of the essence." (*Riddle, supra,* 83 Cal. App.3d 563, 572.) The *Riddle* court further declared that "we deduce that an emergency sufficient to excuse the *Miranda* requirements contains the following elements: [¶] 1. Urgency of need in that no other course of action promises relief. [¶] 2. The possibility of saving human life by rescuing a person whose life is in danger; [¶] 3. Rescue as the primary purpose and motive of the interrogators." (*Id.* at p. 576.) The holding of *Riddle* was that the situation confronting the interrogating officers constituted such an emergency, and justified the renewed interrogations of the defendant.

Defendant before us attempts here to distinguish the *Modesto, Dean* and *Riddle* decisions, characterizing the interrogation technique employed by Sergeant Hester as typical third degree, and asserting that Hester's primary purpose was not to save Rachel Sparling's life but, rather, to obtain incriminating statements from defendant. As *Riddle* points out, however, an interrogation concerning "rescue" might ordinarily have the dual purpose of both rescue and incrimination, but so long as the developed facts show the motive behind the interrogation to be *primarily* that of rescue, the interrogation is justifiable despite an apparent *Miranda* violation. Under such circumstances, the *Miranda* constitutional protection is deemed to be inapplicable.

We need not repeat our summary of what was known to the Pasadena police on the morning of March 15, 1977. The reasonable conclusion to be drawn from the evidence is that defendant was perceived by them as the only source they had to determine Rachel Sparling's then whereabouts, and that despite her disappearance some 16 hours before, she might indeed be alive and in need of assistance. We deem it immaterial, despite defendant's argument to the contrary, that Sergeant Hester approached the task of interrogating defendant somewhat circuitously; the urgent nature of the situation was not dissipated by the fact that Hester chose to bring up his concern about the victim toward the end of the interrogation effort.

We conclude that, in the case at bench, the particular facts as developed by the police demonstrated a genuine emergency which justified renewed interrogation despite *Miranda*. It follows that the admissions obtained from defendant thereby were not rendered inadmissible either by virtue of *Miranda* or other federal or state constitutional principles.

V

*The Viability of Defendant's*
*Remaining Contentions*

A. *Inadequacy of Trial Counsel*

■ Defendant challenges the adequacy of his trial counsel, contending that the asserted inadequacy deprived him of his constitutional right to the effective assistance of trial counsel. Defendant specifically asserts that his trial counsel was inadequately prepared to present the "search and seizure" aspects of the case at the suppression-of-evidence hearings

—making arguments in favor of suppression which were ill-advised while ignoring others which might have proved more productive.

In *People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859], the court established the principle that a criminal defendant's federal and state constitutional rights to adequate counsel are only satisfied through representation by "a reasonably competent attorney acting as a diligent, conscientious advocate." A defendant bears the burden of demonstrating (1) that counsel deviated from this standard, and (2) that his "counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*Id.* at p. 425.) *Pope* further held that reversal of a conviction upon the ground of inadequacy of trial counsel is required only when the record contains an explanation for the assertedly inadequate representation which in fact demonstrates less than reasonable competence.

What emerges from review of the evidence presented during the suppression-of-evidence hearings below is simply that trial counsel was unable to persuade the trial judge that the *Modesto-Dean-Riddle* "rescue doctrine" or the "exigent circumstances" principle of *Ramey* did *not* provide a basis for an exception to be made to *Miranda* and *Ramey* and render the usual strictures of search and seizure irrelevant. The record below demonstrates that defendant was not deprived of a "potentially meritorious defense" by any conduct of his trial counsel. We find no meaningful deviation from the constitutional standard mandated by *Pope*.

### B. *The Gruesome Photographs*

Eighteen photographs of the victim taken during the autopsy were offered by the prosecution for admission into evidence. Objection was made by defendant's counsel that some of them were unduly prejudicial and inadmissible under application of Evidence Code section 352. The trial court reserved its ruling on admissibility until they could be examined. The trial court's ultimate ruling was to exclude ten of the photographs and to admit eight. Trial counsel renewed his objection to *three* photographs the court had determined to admit into evidence. These were designated as People's exhibits K, L and R. The objection was overruled.

■ On this appeal, defendant contends that the trial court's ruling constituted prejudicial error. We have examined the photographic ex-

hibits in question. The evidentiary principle is well established that when relevant evidence is sought to be introduced and an Evidence Code section 352 objection is made that the prejudicial character of such evidence substantially outweighs its probative value, the trial court must exercise its discretion in assessing the objection. (Evid. Code, § 352.) The guidelines for such assessment were analyzed at length by us in *People v. Gibson* (1976) 56 Cal.App.3d 119, 134-137 [128 Cal.Rptr. 302].)

It can safely be said that, without significant contradiction, most, if not all, photographs of a victim are "gruesome," depicting as they do in criminal cases, violent death. The issue is one of determining the extent of probative value they possess as opposed to the danger of undue prejudice to defendant engendered by such evidence. Such photographs are often admitted as relevant evidence for the purpose of clarifying medical testimony (*People v. Murphy* (1972) 8 Cal.3d 349, 364-365 [105 Cal.Rptr. 138, 503 P.2d 594]), or for the assistance provided in establishing elements of the crime (*People v. Slone* (1978) 76 Cal.App.3d 611, 632 [143 Cal.Rptr. 61]), including the existence of malice, premeditation or the negation of some asserted defense (*People v. Jentry* (1977) 69 Cal.App.3d 615 [138 Cal.Rptr. 250]).

It is accepted evidentiary law that the trial court is entitled to exercise considerable discretion in this area. Prejudice may become a telling factor in cases where the evidence of a defendant's guilt is contradictory rather than overwhelming, and asserted "overkill" by the prosecution can be identified as contributing directly to a conviction which might otherwise not have been obtained. We find minimal probative value in the photographs to which defendant particularly objects, and they were indeed gruesome. We cannot say, however, in view of the overwhelming nature of the case presented against this defendant, that had they not been admitted into evidence, a result more favorable to him would have been obtained. We hold, therefore, that the error in admitting the photographs was nonprejudicial. (*People v. Duran* (1976) 16 Cal.3d 282, 296 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

C. *Sentencing Errors*

The Attorney General concedes that the trial court erred in sentencing this defendant because, at the time of the commission of the offenses charged, Penal Code section 669 forbade consecutive life

sentences; in addition, the enhancements found to be true for counts I and II were improperly imposed by the trial court. (See *People v. Sewell* (1978) 20 Cal.3d 639, 642 [143 Cal.Rptr. 879, 574 P.2d 1231]; *People* v. *Walker* (1976) 18 Cal.3d 232, 243-244 [133 Cal.Rptr. 520, 555 P.2d 306].)

The judgment is hereby modified to reflect the imposition of only one life sentence, without enhancement, on count I. Similarly, count II is modified by removing the enhancement of sentence. As so modified, the judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 4, 1980.