The STATE of Utah, Plaintiff
and Appellant,

v.

Joseph Duane WARD, Defendant
and Respondent.

No. 14903.

Supreme Court of Utah.

Nov. 9, 1977.

Vernon B. Romney, Atty. Gen., R. Paul Van Dam, Salt Lake County Atty., Robert Stott, Deputy Salt Lake County Atty., Salt Lake City, for plaintiff and appellant.

Larry R. Keller of Salt Lake Legal Defenders Ass'n, Salt Lake City, for defendant and respondent.

CROCKETT, Justice:

The State appeals from an order granting the defendant's motion to quash the information charging him with first degree murder on the grounds that he had been granted immunity by the State.[1]

1. U.C.A.1953, Sec. 77–39–4: "An appeal may be taken by the state: (1) From a judgment of dismissal in favor of the defendant upon a motion to quash the information or indictment."

At about 10:00 p. m. on the night of May 15, 1976, Richard B. Anderson was on duty in the Circle K store at about 7300 South on 13th East in Salt Lake County when a robbery occurred during which he was shot and killed. The next day, in making a house to house investigation in the neighborhood, Deputy Sheriff Jay Labrum talked with the defendant, Joseph Duane Ward. For reasons not material here, Deputy Labrum later checked and learned that Ward had previously been involved in serious crime and was on parole upon a conviction of armed robbery.

The following day the defendant was brought for questioning to the office of Sgt. Riley Cannon, who was in charge of the investigation. The defendant insisted that he was not involved in and had no knowledge of the crime; and that he had been at his in-laws' home at the time it occurred. But he also told the officers that before he had left home that evening, he had been visited by two men he had known in prison, Larry Neff and Ron Lyle; and that it had crossed his mind that those two may have been involved in the robbery-killing.

Upon the officer's checking on defendant's story, his wife corroborated his statement that Neff and Lyle had visited them on that evening just before they left home; and she had her parents verified that Ward had been at the home of the in-laws. It was also learned that Ward had formerly worked at the Circle K where the crime occurred.

In connection with further questioning the following day, Sgt. Cannon told the defendant that if he had knowledge of the crime but was not the trigger man, he would talk to the county attorney about the possibility of immunity.

Myron March, defendant's parole supervisor, then spoke with Mr. Ward, and also told him that if he were not the trigger man, but might otherwise be involved in the crime and have some knowledge that would be helpful to the State in solving it, immunity would be a possibility. He also assured the defendant that if he furnished such information no action would be taken against him upon his parole, so long as he was not actively involved in the killing and did not pull the trigger. The defendant again assured Sgt. Cannon that he was not involved in the crime and particularly stated that he was not the killer.

Shortly thereafter Sgt. Cannon contacted the county attorney's office to explain the situation. Richard Shepherd and Glenn Iwasaki, Deputy County Attorneys, came to Sgt. Cannon's office where the likelihood of defendant's involvement and what he might know were discussed. Based on the defendant's story, its verification by his wife and her parents, and the fact that it would seem unlikely that the defendant would rob a store within a few blocks of his home and where he formerly worked, Mr. Shepherd and Mr. Iwasaki decided that they would make an offer of immunity to Mr. Ward which they state was to be only if he were involved in the planning or concealing of the crime, but not if he were actively involved in the killing. At Mr. Shepherd's request, Mr. March went into the other room and asked the defendant if he was so involved as the "trigger man;" and the defendant said he was not.

Questioning of the defendant then resumed. Those present for the session, which was recorded on tape, were Mr. Shepherd, Mr. Iwasaki, Mr. March, Sgt. Cannon, Detective Jay Labrum, Sgt. John Bernardo and Detective Ben Forbes. In regard to the question whether the proffer of immunity to defendant Ward was with the understanding and subject to the condition that he was not the "trigger man" that is, the actual killer, it is important to examine the conversations preceding defendant's confession as recorded on tape. They were in part thus:

Mr. Shepherd said to the defendant: "As it stands now I can see no reason why we can't extend you immunity. It doesn't appear that there is any criminal involvement or even if there were that we could extend you immunity for criminal prosecution arising out of this incident. . . ."

Mr. Iwasaki asked the defendant if he was ready to talk about the incident and defendant said he was. Mr. Iwasaki said: "Well then pursuant to Statute 77–45–21, Mr. Shepherd and myself jointly are granting you immunity for anything that you may say concerning your involvement or what you know of" the incident of May 15.

\* \* \* \* \* \*

Iwasaki: You have nothing to lose in telling us everything that you know, no matter how inconsequential it may seem to you, or if you're hiding anything to the very littlest degree, you know, its going to be in your best interest to come clean fully, because we're not going to be able to do anything to you.

\* \* \* \* \* \*

Bernardo: If you was in the store and you watched it, you got immunity.

Ward: I wasn't . . .

Labrum: If, if you're not, *if you're not the trigger man*, tell us what the hell happened out there.

Ward: All I know is what I told ya.

Labrum: You're not telling us the truth, Joe, and you know it. Now dammit, *the only thing you have to be afraid of is if you pulled that trigger.* And if you didn't you better damn well tell us what happened. . . .

Labrum: At this point sure we're concerned if you was involved in on it. But you've already been told you're not going to be prosecuted for it.

Pursuant to further questioning, defendant Ward explained that it was he who had committed the robbery and had killed Mr. Anderson.

Questioning then continued and toward the end of the interview the following was said on the subject of immunity:

Bernardo: You were told at the top of this thing immunity would be granted . . .

Ward: Yeah.

Bernardo: Unless you pulled the trigger.

Ward: Yeah. [All emphasis herein is added.]

On May 20, 1976, a complaint was filed charging the defendant with first-degree murder; and he was bound over to the district court. It is, from the district court's granting of the defendant's motion to quash the information on the ground that he had been granted immunity that the State takes this appeal.

In seeking the proper interpretation of the immunity statute [2] and its application to this case, it seems appropriate to reflect on the nature of the authorization and how it correlates with fundamental ideals of justice. The granting of immunity is tantamount to granting absolution for crime. This is an awesome power and responsibility which has been considered as belonging only to the king, or the sovereign. But under our democratic system of government, wherein all just powers are reposed in and derived from the people, there is a somewhat different concept. One of its highest ideals is that the law should accord equal and exact justice to all men, rich or poor, humble or great. Sometimes otherwise stated: that there should be equal rights for all and special privileges for none.[3] However, these propositions are also appreciated: that the foregoing are indeed but ideals to be aspired to; and that with the complexities and imperfections of human society, they cannot always be fully achieved.

Sometimes practical exigencies make it necessary and expedient to make what is intended to be a minor sacrifice of the above-stated principle of justice to achieve

2. U.C.A.1953, Sec. 77–45–21: Immunity granted to witness . . . Powers granted prosecuting attorneys . . . . In any investigation or prosecution of a criminal case, the attorney general and any district attorney or county attorney shall have the power to grant immunity from prosecution . . . whenev-er the attorney general, district attorney or county attorney deems that the testimony of such person is necessary to the investigation or prosecution of such a case. . . .

3. Cf. Inscription on the U. S. Sup. Ct. Bldg., Washington, D. C.

**1346**

a greater good. That seems to be the justification for the immunity statute's departure from the equal justice ideal. It is also significant to observe that the statute leaves unsaid anything about the procedure of granting immunity; such as whether it need be in writing, or filed with, or communicated to, or approved by, the court. It is also important to have in mind that there are presently more than fifty deputies in the Attorney General's office and more than twenty-five deputies in the office of the Salt Lake County Attorney, not to mention the numerous other deputies in the other twenty-eight counties of our state. It requires but little reflection to see the potential for disorder or for confusion, and even for collusion, if all of those deputies had the individual prerogative of exercising this great power at their uncontrolled and unrecorded disposal.

Due to the considerations just discussed as to the seriousness of the responsibility imposed, and the fact that it departs from the ideals of equal justice, it is our opinion that the power to grant immunity is of such character that it should not be extended by implication or otherwise beyond the express terms of the statute. Accordingly, immunity can and should be granted with great caution and only in strict compliance with the terms of the statute;[4] that is, only the Attorney General and the county attorney, who are elected by and responsible to the people, may decide upon and grant immunity.[5] That was not done in this case.

In addition to what has been said leading us to the conclusion that there was no valid immunity granted to defendant Ward, there are other observations about this case which support the proposition that the ends

of justice would not be served by enforcing his claim of immunity. Assume for the purpose of further analysis that the county attorney's deputies and subordinates could act responsibly for him in the matter. Then in fairness it would have to be further assumed that what they said to the defendant, and any condition imposed, were part of the negotiations and the arrangement arrived at. Under such a hypothesis, certain other facts and propositions bearing thereon would have to be considered.

The grant of immunity is supposed to be for a quid pro quo in the form of information from the grantee, who is or may be involved in crime.[6] That is, it is in essence a contract. It is fundamental that when any agreement is entered into it should reflect a meeting of the minds of the parties who enter into it; and this in turn includes knowledge of the foundational facts out of which the agreement arises and comes into being.[7] In this instance, if it be assumed that defendant Ward has finally told the whole truth in his statement that it was he alone who committed the robbery and the murder, it must also be assumed that he had knowledge of both that fact and of the fact that the prosecution did not know it, because he repeatedly assured them to the contrary. Further, it was the defendant himself who planted in the minds of the officers suspicion against Larry Neff and Ron Lyle and led them to think that he might have further useful information.

Under that hypothesis, there was not only a failure to disclose material facts, but an active concealment and deceit concerning the foundation upon which the agreement was to be based. Again assum-

---

4. *Nuckols v. Van Wagner*, Okl.Cr., 511 P.2d 1110 (1976); *People ex. rel. Kunce v. Hogan*, 37 Ill.App.3d 673, 346 N.E.2d 456 (1976); *State v. Brown*, Maine, 321 A.2d 478 (1974); *Bowie v. State*, 14 Md.App. 567, 287 A.2d 782 (1972). Cf. *In re Petty*, 18 Utah 2d 320, 422 P.2d 659 (1967).

5. We have reached this conclusion in awareness of Section 68–3–12(17), U.C.A.1953, which provides in permissive terms that the term county attorney "*may* include any deputy or

other person performing the duties of such officer, either generally or in special cases."

6. *State v. Hall*, 65 Wis.2d 18, 221 N.W.2d 806 (1974); *State v. Smith*, 12 Wash.App. 514, 530 P.2d 354; *People v. Brunner*, 32 Cal.App.3d 908, 108 Cal.Rptr. 501 (1973).

7. *United States v. Ciotti*, 469 F.2d 1204 (3rd Cir., 1972); *People v. Brunner*, supra.

ing that the county attorney's deputies and subordinates could act responsibly in the matter, in view of what was said between them, the defendant could not have failed to understand that he would be granted immunity only if he were not the "trigger man" or the actual killer. If as above stated, the whole truth about the matter is that he alone committed the robbery and the murder, to permit him to engage in such chicanery and deception to circumvent the law would be so revolting to one's sense of justice as to hardly require expression; and to hold such a fraudulent agreement binding is certainly something to which this court could not in good conscience give its approval.

█ In view of the conclusion we have arrived at, we think that fairness to the defendant and the interests of justice require us to state that in this case the prosecution should not be entitled to rely on nor to make use of any confession or any other evidence whatsoever they have obtained by reason of what we now determine to be an invalid grant of immunity. But this case should in effect revert to the status it was in prior to such purported grant of immunity for whatever investigation or other disposition may be made of it without such grant of immunity.

In accordance with what has been said herein, it is our judgment that the order quashing the information should be vacated and this case remanded for such further proceedings as may seem advisable, not inconsistent with this decision. No costs awarded.

ELLETT, C. J., and HALL, J., concur.

WILKINS, Justice (dissenting).

I respectfully dissent.

A reading of this record demonstrates that the District Court, after an evidentiary hearing, acted properly and according to law in granting the defendant's motion to quash the information against him on the basis that the prosecution had granted the defendant immunity.

The immunity statute, Utah Code Ann. 1953, Sec. 77–45–21, on which this case focuses, is set out in relevant part as follows:

In any investigation or prosecution of a criminal case, the attorney general and any district attorney or county attorney shall have *the power to grant immunity from prosecution* to any person who is called or who is intended to be called as a witness in behalf of the state of Utah whenever the attorney general, district attorney or county attorney deems that the testimony of such person is necessary to the investigation or prosecution of such a case. *No prosecution shall be instituted against the person for any crime disclosed by his testimony which is privileged under this action*, provided that should the person testify falsely, nothing herein contained shall be construed to prevent prosecution for perjury. [Emphasis added.]

Transactional immunity is that type of immunity which precludes prosecution for any "transaction, matter or thing" about which the witness is compelled to testify. By contrast, use immunity prohibits the *use* of immunized testimony or other immunized information and also prohibits the use of any information directly or indirectly derived from such immunized testimony or other immunized information, but does not prohibit a subsequent prosecution based on independent evidence.

It would seem that the language of the statute, "no prosecution shall be instituted against the person for any crime disclosed by his testimony which is privileged under this action," although not the traditional language of "transaction, matter or thing," conveys a meaning more similar to that of transactional immunity. Furthermore, it is specifically set out that this statute confers the "power to grant immunity from prosecution." Were the statute intended to be the use type, more precise wording would have been used, not precluding *prosecution*, but precluding the *use of immunized testimony* in a prosecution.

The State contends that a liberal reading of the statute, along with consideration of

public policy, permits the statute to be interpreted as providing for use immunity. The assertion is made that the language found in an Ohio use immunity statute, Ohio Revised Code 2945.44, which grants immunity to a person "from any prosecution *based on his testimony* . . ." is similar to the language found in the statute in question, which declares that "no prosecution shall be instituted against the person *for any crime disclosed by his testimony.*" (Emphasis added.) The distinction seems obvious. For example, suppose that a witness, while under a grant of immunity, confesses to a crime. In Ohio, a prosecution may be brought, but it may not be based on the confession nor can the confession be used as evidence. However, in Utah, the witness cannot be prosecuted "for any crime disclosed by his testimony." Since the confession discloses the crime, no prosecution for that crime may be brought.

The majority opinion would in effect extend use immunity to the defendant for reasons stated therein even though that opinion holds that there was an invalid grant of immunity. But I believe transactional immunity must be given to the defendant under our immunity statute and the circumstances of this case.

I do not agree that a deputy county attorney should be denied the power to grant immunity under the present statute, Sec. 77–45–21, supra, because it is couched in terms of "county attorney" and not "deputy." A more reasonable and sensible interpretation of this statute and Utah Code Ann., Sec. 68–3–12(17), cited in the majority opinion, which allows the deputy to perform the duties of county attorney, would be one which upholds the right of the deputy to act in matters of immunity. And, I submit, this conclusion is reinforced by the practice and need of deputies in the attorney general's and county attorney's offices to assume the most awesome responsibilities in and out of court in performance of their responsibilities. They are members of the Utah State Bar and officers of the Courts of this State. And I therefore do not sense the "potential for disorder or for confusion, or even collusion" mentioned in the majority

opinion if deputies exercise powers of granting immunity. I do believe a mistake was made in this case, but that should not become a basis for deprivation of the powers of deputies to act in these matters.

I turn now to the matter of alleged fraudulent inducement by the defendant, and in this matter, the facts are very important. Many are enumerated in the majority opinion. But it should be emphasized that defendant did not request immunity from anyone, and he did not bargain for immunity. He was quizzed by the sheriff's detectives, his parole officer, and the deputies for several hours on three occasions without an attorney. Further he was granted *unconditional* immunity by the deputies without their inquiring of him about his being the "trigger man" or their placing any other conditions of his involvement in the crime upon the grant of immunity.

The District Court, after an evidentiary hearing, as noted earlier, made careful findings of fact and conclusions of law, which I believe this Court should sustain. The Court concluded in writing:

> It is possible for the immunity granted pursuant to the aforementioned statute to be fraudulently induced by subterfuge or deceit, but such fraudulent inducement must be established by clear and convincing evidence.

> Plaintiff in this action, the State of Utah, failed to establish that the immunity was fraudulently induced by the defendant.

And the District Judge made some very perceptive comments from the bench when he ruled in this difficult and emotionally charged matter, which are worthy of inclusion in this dissent. They are:

> . . . immunity is not granted to people who are thought by the police or prosecutor to be innocent, or who believe that they are innocent; . . . immunity [in that instance] would be unnecessary . . . .. Rather, it is a grant to persuade the culpable to speak . . . [and it therefore aids] in the investigative process.

Immunity is granted in exchange for information needed. But . . . immunity ought not to supplant and take the place of the investigative process; that is, it may be the easy way out in many instances, it may be the easier way to get to the ultimate goal. But one vested with the power of granting immunity . . . [has] pretty absolute power [and] ought to proceed with considerable caution; and if the Government, having granted immunity, obtains an answer contrary to that which it hopes to get and which it expects, one ought not to say that that is a basis for again revoking an immunity granted . . . that is a risk that one takes in relying on the grant of immunity and in lieu of extensive investigations.

I believe the District Court should be affirmed.

MAUGHAN, J., concurs in dissenting opinion of WILKINS, J.