The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Elizabeth MANNING,
Defendant-Appellee.

No. 83SA258.

Supreme Court of Colorado,
En Banc.

Nov. 15, 1983.

Alexander M. Hunter, Dist. Atty., C. Phillip Miller, Peter A. Hofstrom, Chief Deputy Dist. Attys., Boulder, Mary R. Cook, Denver, for plaintiff-appellant.

Howard Bittman, C. Paul McCormick, Boulder, for defendant-appellee.

ROVIRA, Justice.

The People appeal a Ruling and Order of the Boulder District Court suppressing certain statements of the defendant, Elizabeth Manning, as well as all evidence gathered by the police before and after those statements were made. C.A.R. 4.1. We agree that the statements were obtained as a result of a promise made to the defendant and must therefore be suppressed. Under the "fruit of the poisonous tree" doctrine, all evidence gathered as a direct result of those statements must also be suppressed.[1] We disagree, however, with the trial court's conclusion that all evidence gathered prior to Manning's statements is inadmissible. Consequently, we affirm in part and reverse in part.

I. Facts

On December 29, 1982, Cecelia Sopher contacted the Boulder Police Department and reported that her three-year-old nephew, Michael Manning, had apparently disappeared. Sopher had been attempting to contact Michael for some time, but the boy's mother, Elizabeth Manning, refused to let her see or talk to Michael. The police department assigned two juvenile detectives, Greg Bailey and Ed Folliard, to investigate the complaint and, if necessary, to locate the missing boy.

Bailey and Folliard went to the Manning apartment on December 29 and talked to Manning and her live-in boyfriend, Daniel Arevalo, about Michael's whereabouts. Both were uncooperative and refused to answer questions, except to say that Michael was staying with friends. As a result, the detectives obtained a court order requiring Manning to appear in Boulder District Court later that afternoon and to bring Michael with her. When she came to court alone, Judge Richtel appointed counsel and then ordered her to produce Michael by December 30 or be found in contempt of court.

On December 30, Manning reappeared in court without Michael. When asked about her son, she invoked her right under the fifth amendment to remain silent, indicating that any statement she made about Michael might tend to incriminate her. The judge thereupon held Manning in contempt for defying the court's order and remanded her to the county jail until she revealed the

1. *See Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Saiz,* 620 P.2d 15 (Colo. 1980); *People v. Bates,* 190 Colo. 291, 546 P.2d 491 (1976).

location of her son.[2] Manning has remained in jail under this civil contempt order since December 30, 1982.

Between December 30 and April 12, 1983, when the body of Michael Manning was found in a drainage ditch, Bailey and Folliard conducted an extensive investigation into the boy's disappearance. They searched the Manning apartment and seized several bags of toys and children's clothing which appeared ready for disposal. They contacted most of the people listed in Manning's address book for information about Michael. They tracked down leads from more than 100 phone calls made to the Crime Stoppers program. They interviewed known prostitutes in Boulder and Denver after learning of Manning's prior arrest for prostitution. Until mid-April, Bailey and Folliard worked full time on the Manning case amidst intensive media coverage and growing public concern for Michael's safety.[3]

While the detectives gathered information, Manning continued to maintain that Michael was fine and with friends. She indicated to reporters that her silence about Michael's whereabouts stemmed from her fear that the Boulder County Department of Social Services (Social Services) would take custody of Michael if she complied with the court order. Since Manning's twelve-year-old daughter, Tricia, had already been placed in a foster home by Social Services, Manning's stated reason for not talking about Michael appeared at least marginally credible.

At the same time, however, Bailey and Folliard had reason to be skeptical about Manning's story. Sopher reported that another of Manning's children, Christopher, had disappeared in Baltimore, Maryland, in 1974. Manning claimed to have left the seven-month-old Christopher at Johns Hopkins Hospital, but Baltimore police could find no record of an abandoned child fitting Christopher's description. In addition, the detectives heard rumors that Manning may have sold Michael on the black market and that Arevalo may have physically abused the child. On January 6, 1983, Tricia told Bailey that Arevalo had slapped Michael, forced him to consume excessive amounts of fluids, and then locked him in his room for long periods of time during November and December 1982. This information prompted the district attorney's office to offer immunity to anyone who could produce Michael alive or reveal his location to the police.

On January 19, 1983, Bailey and Folliard interviewed Manning twice at the Boulder County jail. In the first interview, Manning told them only that Michael was fine and with friends. Her reluctance to provide details made the detectives realize that they would have to offer concessions if they hoped to move the investigation along. They returned that afternoon, after clearing their actions with the county and district attorney's offices, and offered Manning custody of both children and immunity from criminal prosecution if Michael was returned alive and well. Manning remained distrustful, however, and challenged Bailey and Folliard's authority to secure custody of her children as part of the deal. The offer of immunity was apparently not discussed. Manning asked for one week to consider the proposal, but she never formally responded, even though Folliard renewed the offer of immunity on January 20.

2. *See* sections 19–3–101 to –120, C.R.S.1973 (1978 Repl.Vol. 8 and 1982 Supp.). Section 19–3–103(3) provides that "[t]he summons shall require the person or persons having the physical custody of the child to appear and to bring the child before the court at a time and place stated." Section 19–3–104(1) provides that "[a]ny person summoned or required to appear as provided in section 19–3–103 who has acknowledged service and fails to appear without reasonable cause may be proceeded against for contempt of court."

3. *See, e.g., 3-year-old's Whereabouts Remain a Mystery,* Boulder Daily Camera, Jan. 21, 1983, at 1C; *Nationwide Alert Issued for Missing Child,* Denver Post, Jan. 7, 1983, at 1A; *Boy's Disappearance Baffling, id.,* Jan. 1, 1983, at 1C. Before the hearing on the motion to dismiss, the defendant subpoenaed six folders of articles from area newspapers. These folders were accepted as exhibits and are part of the record in this case.

A week later, Bailey again interviewed Manning, but she provided no new information and explained once again that Michael was fine and with friends. The only other contact between Bailey and Manning during the next two months occurred in late March, when Bailey asked to see Manning and she refused, stating she had nothing to say to the detective. By this time, Bailey had observed that Manning drew her legs up to her chest and assumed a "fetal" position in her chair whenever she wanted to terminate a conversation. Within several minutes after exhibiting this characteristic, Manning would stop talking altogether.

In early April 1983, Bailey and Folliard received a directive from their supervisors indicating that unless new evidence surfaced in the next week or two, the Manning case would have to be closed. Just when it appeared that closure was imminent, Bailey learned that Tricia Manning had been deposed on April 6 in connection with a dependency and neglect proceeding. She testified that Arevalo had beaten Michael severely in December 1982. She described Michael's staggered walk and the way his eyes kept rolling back in his head. At this point, Bailey realized that Michael had been more seriously abused than anyone working on the case had imagined. Hoping for the best, he nevertheless began to focus on the possibility that Michael was already dead.

On April 8, Bailey tried to pinpoint areas near the Manning apartment where the body of a small child might be concealed. He contacted officials at the Burlington Northern Railroad, which maintained a set of tracks behind the apartment where Manning lived. He also made tentative plans to send divers into nearby Hadden Lake to look for Michael's body. In the wake of these efforts, Bailey received word that the Colorado Court of Appeals had overturned the dismissal of Manning's earlier appeal challenging the contempt order of Judge Richtel. It authorized her release from custody if she could post a $1,000 bond. Bailey

felt that, under the circumstances, he should try again to establish a rapport with Manning before she was released.

At 5:00 p.m. on April 8, he went to see Manning to discuss the new information about Michael. He told her that Michael's disappearance was highly suspicious and that he feared Michael was severely injured or dead. He tried to minimize her responsibility for whatever had happened. Manning refused to say anything new and demanded the return of her address book. Bailey decided to end the conversation and then said on his own initiative: "Betsy, you can either be a witness in a murder case or be a suspect in a murder case, it's up to you." Manning noticeably flinched and asked what he meant. Bailey responded: "Exactly what I said."

On April 9, anticipating that Manning was going to post bond, Bailey asked jail authorities for advance notice of her release. At this time, there were no plans to conduct a surveillance on Manning after she was freed. The possibility existed, therefore, that upon her release the investigation might never be concluded. Bailey received a call from jail authorities that evening, indicating that Manning's bond was about to be posted. He went to the county jail in uniform at 11:30 p.m. and found Manning in street clothes in the booking area. She saw Bailey and said: "Greg, I want to talk to you."[4] Bailey took Manning to an interrogation room and asked what she wanted. Manning responded: "Is Danny worth three people?" Bailey asked what she meant, and Manning repeated: "Is Danny worth three people, I can give you Danny." He asked her to explain, and Manning said she would provide information about Danny Arevalo if he could arrange to have three friends released from jail. Two were in the county jail in Boulder. The third was in prison in Canon City. Bailey asked if the three knew anything about Michael, and Manning responded that a letter sent to the Canon City inmate would tell everything.

---

**4.** Before leaving the jail, Manning told fellow prisoners that she would be back soon. "Something heavy is going to be coming down," she said, adding that it could be good or bad and that the other prisoners would find out about it sooner or later.

The detective then indicated that he had no authority to speak for the Department of Corrections, which had custody of the Canon City inmate, but that if Manning's statement was truthful he would see what he could do for her three friends. He said he was only concerned with finding and helping Michael.

At this point, Manning began to draw up into the fetal position that Bailey had noticed before. Fearing that she was terminating the conversation, he made a deliberate decision not to read her *Miranda*[5] rights to her and then said on his own initiative: "I am going to interview you as a witness in this thing. Because I am not going to advise you of your rights, they cannot prosecute you for this." Manning responded: "I will do whatever I have to do to make sure that he pays for what he did, perhaps I can also help my friends with the information." Bailey told her to "[g]o ahead and tell me what you've got," and Manning said: "Mikey's dead." The detective then remarked: "Elizabeth, you don't really mean that," to which Manning replied: "Yes, Danny beat Michael to death." She explained that Arevalo had beaten Michael for several hours with a belt on December 17, 1982, and that Michael had died in his bed at about 1:30 p.m. Manning watched the beating and apparently tried once or twice to intervene. After Michael died, she and Arevalo wrapped the body in a shower curtain and hid it first in a bathroom and then in a heating vent for several weeks. When the police came to the apartment, Manning and Arevalo opened the windows to allow the odor of the decomposing body to escape detection. Finally, after Manning was ordered to jail, Arevalo took the body and placed it under some brush in a nearby drainage ditch. He and Manning had picked the disposal site during a walk in the park after Michael's death.

This crucial conversation lasted only five or six minutes. When it ended, Manning informed the bail bondsman that she had decided not to leave jail. Before morning, Bailey conducted two interviews which were taped and transcribed. Before each session, Bailey again told Manning that she was being interviewed as a witness. Based on the information she provided to Bailey, the police found Michael's body in a shallow grave near a drainage ditch on April 12, 1983. Ten days later, the district attorney filed six felony charges against Manning, including first-degree murder, child abuse resulting in death, first-degree assault, and three counts of accessory to crime.

## II. Trial Court's Ruling and Order

On May 12, 1983, Manning filed a motion to dismiss the charges against her. She argued that Bailey's statements on April 8 and 9 represented "a conscious decision to treat Defendant as a witness and not a suspect" in the disappearance and death of her son. She concluded that

"[a]n agreement was reached between a law enforcement official, speaking on behalf of and as an agent for the prosecuting authority and the Defendant, to wit: If the Defendant provided said authority with information as to the whereabouts of her son and what happened to him, the Defendant would be a witness in any potential criminal prosecution and would not and could not herself be prosecuted for crimes with which she might be charged as a consequence of the evidence provided."

The parties stipulated that the court should rule on the motion to dismiss before it conducted a preliminary hearing. The trial court therefore scheduled a hearing on Manning's motion for June 13. At that hearing, the court heard extensive testimony from Bailey about the three-month investigation and about his conversations with Manning. It also heard testimony from two prisoners who were in the county

---

5. In *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–1627, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that, prior to "custodial interrogation," a suspect must be warned "in clear and unequivocal terms": (1) that he has the right to remain silent; (2) that anything he says can and will be used against him in court; (3) that he has the right to consult with a lawyer and to have the lawyer with him during interrogation; and (4) that if he cannot afford a lawyer, one will be appointed to represent him.

jail with Manning on April 9. Realizing that "the decision on this issue . . . could . . . be dispositive of a large portion of this case or all of it," the trial judge issued his Ruling and Order on June 20, 1983, and this appeal followed.

The trial court relied almost exclusively on the principles outlined by this court in *People v. Fisher,* 657 P.2d 922 (Colo.1983), for determining the effect of government promises to criminal suspects or defendants. In *Fisher,* the police in Oklahoma City asked the defendant if he would agree to be interviewed on videotape about burglaries he had committed. The videotape was intended as an instructional device for police cadets. The defendant agreed to the interview and signed a release which included the statement: "I further refuse to give my permission for this video tape to be used in any criminal procedings [sic] against myself. . . ." *Id.* at 924 & n. 2. Two years later, after the defendant was arrested in Colorado, the prosecution attempted to introduce the Oklahoma videotape into evidence. The trial court ordered its suppression, concluding that the defendant was entitled to enforcement of the government's promise not to use the videotape in any criminal proceeding. *Id.* at 925 n. 5.

On appeal, we affirmed stating:

"We hold that because the officer's promise implicated [the] constitutional rights of the defendant, because the defendant took detrimental action in reasonable reliance upon the promise, and because no other remedy short of enforcement of the promise would secure fundamental fairness to the defendant, the Due Process Clauses of the United States and Colorado Constitutions, *U.S. Const.* Amend. XIV; *Colo. Const.* Art. II, Sec. 25, require suppression of the Oklahoma videotape in the pending Colorado prosecution."

*Fisher,* 657 P.2d at 925. The constitutional rights implicated by the defendant's "statement" were the right against self-incrimination, *U.S. Const.* amend. V; *Colo. Const.* art. II, sec. 18, and the right to counsel, *U.S. Const.* amend. VI; *Colo. Const.* art II, sec. 16. The defendant relied to his detriment

by performing his part of the bargain and revealing incriminating information to the government. The remedy of specific performance was the only remedy, in our view, which rendered substantial justice to the defendant. As a result, after analogizing to the law of contracts, we concluded that "the Due Process Clause of the Fourteenth Amendment furnishes the basis for the enforcement of a governmental promise made to an accused during the pendency of a criminal prosecution against him." *Fisher,* 657 P.2d at 927.

In his Ruling and Order, the trial judge incorporated the three *Fisher* criteria for enforcement of government promises. He decided that Manning's "cooperation" in "making statements in response to and in reliance upon Officer Bailey's commitments specifically impacted and implicated her privilege against self incrimination and her right to effective assistance of counsel." In addition, her actions exhibited detrimental reliance, since "she clearly made no statement and volunteered no factual information before receiving the officer's assurances she would not be prosecuted. There was clearly reliance upon Officer Bailey's commitment in making the statements and the evidence establishes that, but for those assurances the statements would not have been made." Lastly, the court held that specific performance of the promise not to prosecute was the appropriate remedy. "At stake is the honor of the Government," the trial judge concluded; "Detective Greg Bailey made a reasonable, conscious, investigative decision to treat the Defendant as a witness and the fact that others may, in hindsight, find it inconvenient to support that decision does not justify the Court's withholding judicial enforcement of his commitment. To hold otherwise would involve the Court in an artifice perpetrated upon the Defendant."

The prosecution argued that any commitment by Bailey was ambiguous and conditional and is therefore unenforceable. The trial court disagreed, however, and repeated that, "in light of the surrounding circumstances," Bailey's words were "clear and

unambiguous." Furthermore, "the request for information was *not* conditioned upon the production of Michael Manning alive and healthy.... Officer Bailey did not state or imply any conditions in his request to treat the Defendant as a witness rather than a Defendant...." (emphasis in original). The court quoted *Fisher,* 657 P.2d at 930, where we indicated that the government should not make broad promises to an accused and then "seek to attribute a narrow scope or significance to those promises in an effort to escape resulting obligations."

The prosecution also argued that the urgent need to locate and help Michael justified the alleged impropriety on the part of Bailey. The government, as a result, should be excused from any promise made to Manning under the emergency or rescue doctrine. Again the trial court disagreed:

"It is clear here that there was no continued emergency situation.... The supervising police authorities had concluded that no further productive purpose could be served by continuing the investigation. Officer Bailey made his commitment to the Defendant as a last effort to bring his investigation to closure without the earlier pressing urgency to find and protect Michael Manning. None of the elements necessary to application of the rescue doctrine are present in this case."

After concluding that Bailey made a promise to treat Manning as a witness, and that his commitment was governed by *Fisher,*[6] the trial court fashioned a suppression remedy that was not, in its words, as "drastic" as the order of dismissal requested by Manning. It decided that outright dismissal was not the appropriate remedy, since

"[t]he commitment of the detective falls short of a promise, that the Defendant would not be prosecuted." At the same time, "[t]he Court must give effect to the promise made to the Defendant ..., that, upon the evidence then available, the statements she might make and the product of those statements, she would be treated as a witness and could not be prosecuted." It therefore ordered that

"(1) All evidence gathered in the police investigation and known to Detective Bailey prior to April 10, 1983, shall be inadmissible in the proceedings against the Defendant, because that information formed the basis for Officer Bailey's decision to treat the Defendant as a witness.

"(2) All statements made by the Defendant to Officer Bailey or others between April 9, 1983, and April 22, 1983, shall be inadmissible as made during the period Defendant was assured she would be treated as a witness.

"(3) All evidence, whether testimony or exhibits, discovered with the assistance of Defendant's statements shall be inadmissible as a fruit of the breach of the enforceable commitment made to the Defendant."

### III. Issues before the Court

There are five issues to be resolved in this appeal: (1) was Detective Bailey authorized to make a promise that is binding on the government? (2) did Bailey, in his conversations with Manning, make a promise or commitment of some kind? (3) if so, what was the nature and scope of the promise, and did Manning reasonably and detrimentally rely on the promise? (4) is the emer-

---

**6.** The district attorney also maintained that any commitment made by Bailey was "fraudulently induced" by Manning's representations that Michael was alive and healthy. The trial court concluded, however, that Bailey "clearly discounted the truthfulness of those statements" and "placed no reliance upon [them]."

In response to the prosecution's argument that the power to grant immunity in Colorado is statutorily limited, and that Bailey was therefore acting in excess of his authority, the trial court quoted *Fisher,* 657 P.2d at 930 n. 11, which held that the police detective in that case

"was no less an agent of the government than the Prosecutor and was ... capable of implicating the Defendant's constitutional rights by his [promise]." The court noted that the Boulder District Attorney's office had authorized the concessions offered by Bailey in January. This action, in its view, "vested the officer with apparent authority which had no communicated limits." Since "that apparent authority was never withdrawn," Bailey was capable of making a promise to Manning that was binding on the government.

gency or rescue doctrine applicable to this case, thus excusing any promise that was made? (5) what remedy, if any, should the trial court have fashioned for Manning?

[1] Before dealing with each of these issues, we should identify three questions that are not a part of this appeal. First, neither the defendant, in her analysis of the alleged promise, nor the prosecution, in its claim that any promise was unauthorized, argue that the Colorado witness-immunity statute, section 13–90–118, C.R.S.1973, is directly applicable to this case. Consequently, any discussion of witness or transactional immunity or promises not to prosecute will focus on the scope and effect of Bailey's "promise" and not on the specific provisions of section 13–90–118. Second, the fact that Bailey spoke to Manning as a "witness," while Arevalo remained a suspect in the investigation, does not, in our opinion, lessen the effect of any commitment that was made. The prosecution suggests that questioning someone as a witness does not imply a promise to continue to treat that person as a witness. While this assertion may be correct, we prefer again to focus on the effect of any promise and not on the intricacies of the witness-suspect distinction. Third, the question of whether Manning's "confession" was voluntary or involuntary is not before this court. We recognize that a confession must be voluntary in order to be admitted into evidence. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Gimmy v. People,* 645 P.2d 262 (Colo.1982); *People v. Thorpe,* 641 P.2d 935 (Colo.1982). In this opinion, however, our resolution of whether Manning's "confession" should be admitted or excluded will be on the basis of the bargain struck by the government and not

the voluntary or involuntary nature of her statements.

**A. The Detective's Authority**

■ The prosecution argues that the trial court's broad suppression order is, in substance and effect, a grant of witness immunity to Manning. Under the terms of section 13–90–118, C.R.S.1973, however, a police officer is not authorized to apply to the court for a grant of immunity or to promise "transactional immunity"[7] to a witness. According to the prosecution, the trial court should not have extended the immunity power beyond the express terms of the statute. *See State v. Ward,* 571 P.2d 1343, 1346 (Utah 1977); *State v. Hargis,* 328 So.2d 479, 481 (Fla.App.1976). Without proper authority, therefore, Bailey's alleged promise should not bind the government in this case. *United States v. Bridgeman,* 523 F.2d 1099, 1110 (D.C.Cir.1975); *Ward,* 571 P.2d at 1346. The prosecution concludes by arguing that *Fisher,* 657 P.2d 922 (Colo.1983), is distinguishable since the promise in that case was not subject to the restrictions of an immunity statute.

What the prosecution overlooks is that the alleged promise in this case was not subject to the restrictions of section 13–90–118 either. If the suppression of Manning's statements was incorrect, the reason will be either that Bailey's comments did not rise to the level of a promise, or that the promise he made was excusable. Under these circumstances, we hold that Bailey was an agent of the government when he talked to Manning. In January, he was expressly authorized to promise Manning that she would not be prosecuted if she revealed the location of her son and if he was alive and healthy. In April, Bailey made statements on his own initiative; nevertheless, he possessed the necessary apparent authority[8] to

---

7. The type of immunity envisioned by section 13–90–118 is necessarily "transactional" and precludes prosecution for any matter about which a witness testifies. *Steinberger v. District Court,* 198 Colo. 59, 596 P.2d 755 (1979); *People v. Lucero,* 196 Colo. 276, 584 P.2d 1208 (1978); *Wheeler v. District Court,* 184 Colo. 193, 519 P.2d 327 (1974).

8. The *Restatement (Second) of Agency* § 8 (1958) defines "apparent authority" as "the power to affect the legal relations of another person by transactions with third persons; professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." This type of authority is created "as to a third person by written or spoken words or any other conduct

bind his principal, the government. *See Gilmore v. Constitution Life Insurance Co.,* 502 F.2d 1344 (10th Cir.1974); *Westinghouse Credit Corp. v. Green,* 384 F.2d 298 (10th Cir.1967); *Bowser v. Union Bag Co.,* 112 Colo. 373, 149 P.2d 800 (1944); *White v. Brock,* 41 Colo.App. 156, 584 P.2d 1224 (1978); *Russell v. First American Mortgage Co.,* 39 Colo.App. 360, 565 P.2d 972 (1977).

As an agent, Bailey was capable of implicating Manning's constitutional rights by any promise or commitment that he made. *Fisher,* 657 P.2d at 930 n. 11. Any result to the contrary would be unsound from both a legal and a practical standpoint. If police officers were free to make promises to actual or potential defendants, knowing that the government could, without consequence, deny or disaffirm those commitments, the temptation would be great to use unauthorized promises as a device for extracting confessions. *See People v. Bookman,* 646 P.2d 924 (Colo.1982) (confessions should not be obtained by promises of special consequences); *People v. Scott,* 198 Colo. 371, 600 P.2d 68 (1979) (confessions obtained by direct or indirect promises, however slight, will be considered involuntary).

B. The Promise, the Scope of the Promise, and The Issue of Reliance

■ We must initially resolve whether Bailey in fact made a promise to the defendant. If he did, we must then determine the scope of the promise and address whether Manning reasonably and detrimentally relied upon the promise.

**1.**

The People argue that Bailey's comments on April 9 did not constitute a promise. They present this argument in summary fashion, however, relying on assertions that Manning could not reasonably have interpreted Bailey's words as a promise or that the trial court was unreasonable in its conclusion that a promise was made. The defendant, on the other hand, adopts the same approach but positions herself at the opposite end of the spectrum. She simply assumes that a promise was made by Bailey and that the promise was evidenced by his statements of April 8 and 9. In order to determine if a promise was made, we must analyze the form and content of Bailey's words and the circumstances under which they were spoken.

In our view, Bailey's statements to Manning on April 9 do not represent an express promise. On that occasion, Bailey stated to the defendant: "I am going to interview you as a witness in this thing. Because I am not going to advise you of your rights, they cannot prosecute you for this." These statements were not structured in promissory terms and, at least when considered on their face and independently of the circumstances, might possibly be interpreted as an expression of Bailey's opinion as to the effect of his interview of Manning as a witness.

Nevertheless, even though Bailey used no promissory language in speaking to Manning on April 9, his words spoken, when viewed in light of the surrounding circumstances, did constitute an implied promise. Previously, in January, Bailey had expressly offered Manning custody of both children and immunity from all criminal prosecution upon the safe return of Michael. Later, on April 8, Bailey ended his interview with Manning by saying: "Betsy, you can either be a witness in a murder case or be a suspect in a murder case, it's up to you." On April 9, after Manning initiated the conversation and bargained unsuccessfully for her friends, Bailey then made the statement in issue here. Considering the initial custody and immunity offer in January, plus Bailey's continuing efforts to bargain with Manning over the return of the child, we are satisfied that the only reasonable construction to be placed upon his April 9 statements is that he was obligating himself to take certain actions in exchange for

of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

*Id.* § 27. When an agent acts "within his apparent authority" and contracts on behalf of his principal, the principal is liable on the contract. *Id.* § 159.

any statements from Manning regarding the reason for the child's disappearance and his present whereabouts.[9]

### 2.

The exact scope of Bailey's implied promise is a separate matter. The prosecution contends that if Bailey's words constitute a promise, the scope of the promise was limited. It argues that the phrase "cannot prosecute you for this," when coupled with the obvious reference to *Miranda,* meant that Manning would not be prosecuted for the statement she was about to give.[10] In its view, the trial court unreasonably interpreted "for this" as referring to any crime Manning may have committed, and by granting her de facto enforcement of a promise not to prosecute, the trial court read a broader meaning into Bailey's words than either he or Manning realized.

In response, the defendant argues that the combined effect of Bailey's statements on April 8 and 9 was a promise that Manning would be treated as a witness and not as a suspect in any crime involving Michael. She claims that the comment on April 8 was an "offer" of witness-status, that this offer was never withdrawn, and that she accepted the offer, which remained "vividly in [her] mind," on April 9. She criticizes the prosecution's discussion of the phrase "cannot prosecute you for this" as overly technical and divorced from the actual context in which the statements were presented.

We believe there are at least three possible interpretations of Bailey's statements to the defendant on April 9: (1) an implied promise of full transactional immunity of the type offered the defendant in January; (2) an implied promise of limited immunity not to prosecute the defendant for any crime that she might admit during her ensuing statement; and (3) an implied promise not to use the defendant's statements in any prosecution against her. We are satisfied that under the particular circumstances of this case, the April 9 statements of Bailey can most reasonably and plausibly be interpreted as a promise not to prosecute Manning for any crimes that she might admit in the course of her interview. A review of the circumstances immediately preceding Bailey's statements on April 9 supports this interpretation.

Bailey's statement to Manning on April 8 disclosed that the police considered her either a potential witness against Arevalo or a potential suspect in the as-yet-undetermined crime. Manning understood what Bailey meant and apparently discussed her next move with other persons in the jail. She told them on April 9 that "[s]omething heavy is going to be coming down" and that she would probably remain in jail even though the court of appeals had authorized her release. There is nothing in the record to indicate the nature of Manning's intentions on April 9. Since she initiated the

---

**9.** The promise in this case is different than that in *Fisher,* 657 P.2d 922 (Colo.1983), in which the defendant signed a written document entitled "Release." The Release designated how the videotaped interview with the defendant could and could not be used. The permitted uses included "the training of police officers ... [and] college classroom instruction." The prohibited uses were identified by the following sentence in the Release: "I further refuse to give my permission for this video tape to be used in any criminal procedings [sic] against myself...." *Id.* at 924 & n. 2. We interpreted the Release as an express promise by the government not to use the video tape for the prohibited purpose. We then decided that prosecutors in Colorado should honor the commitment made to the defendant in Oklahoma.

Although Bailey's promise was different from the express promise in *Fisher,* we are nonetheless satisfied that more was involved than in

those cases which have held that police "activity" did not rise to the level of promise. *See, e.g., United States v. Weiss,* 599 F.2d 730 (5th Cir.1979) (F.B.I. statements indicating there was a "possibility" that the defendant might not be indicted or might "walk out scot-free" did not constitute a promise); *United States v. Calimano,* 576 F.2d 637 (5th Cir.1978) (where parties disagreed about the existence of an agreement, trial court's finding of insufficient evidence to show "that the Government made a firm promise or commitment" was not clearly erroneous); *People v. York,* 189 Colo. 16, 537 P.2d 294 (1975) (detective's urgings that defendant cooperate and tell the truth, and that such would be noted in his report, did not render subsequent confession "the product of an improper inducement").

**10.** *See supra* cases cited in note 1.

crucial conversation with Bailey, we can only speculate that she intended to talk to someone before posting bond. When Bailey arrived unannounced at the jail, Manning asked to talk to him and then attempted to bargain for her friends. Presumably, if Bailey had agreed to the release of her friends, Manning would have provided incriminating information about Arevalo. The deal did not materialize, however, and Manning withdrew into the familiar fetal position.

At this point, Bailey realized that Manning was not going to talk after all. After surveying his options, he then decided to interview Manning as a witness and thus dispense with any *Miranda* warning. Having made this decision, Bailey attempted to communicate to Manning the effect of his decision with these words: "Because I am not going to advise you of your rights, they cannot prosecute you for this." The pronoun "they" in Bailey's last statement refers to the government, and the pronoun "this" refers to the information in the statement Manning was about to give. What Bailey was doing was obtaining a statement from the defendant in exchange for his implicit promise not to prosecute her for what she told him.

### 3.

Having determined the scope of the promise, we turn to the question of whether Manning reasonably and detrimentally relied upon the promise. The trial court found and we agree that Manning clearly relied to her detriment on the promise by making a statement which could possibly implicate her in the child's death. What Manning told Bailey was not that she had abused or killed Michael, but that Arevalo had beaten the child for several hours with a belt on December 17, 1982, that she had unsuccessfully tried to intervene, and that she later assisted Arevalo in disposing of the child's body. In view of Bailey's apparent authority to act for the government, which we discussed above, Manning's reliance on Bailey's statements to her was reasonable.

### C. The Rescue Doctrine

Even though Bailey made a promise to Manning, the People argue that they should be excused from any commitment under the emergency or rescue doctrine. In their view, an urgent situation developed on April 7, when Bailey learned for the first time that Michael had been severely beaten by Arevalo. Although he had begun to consider the possibility that Michael was dead, Bailey still had reason to believe the boy might be alive and in need of assistance. In addition, the detective's primary motivation for interviewing Manning at the county jail was not to obtain incriminating statements, but rather, if at all possible, to locate and rescue Michael.

The defendant argues in response that no actual emergency existed on April 8 and 9. Fourteen weeks had passed since Manning appeared in court without Michael. The accumulation of evidence suggested that the child was probably dead and that the expressed concern for rescuing Michael had long since ceased to be realistic. As a result, Bailey was less interested in rescuing Michael than simply in finding out what happened to him. Unless life hangs in the balance, or unless time is of the essence, the rescue doctrine, she claims, should not permit the government to obtain and use a confession in violation of *Miranda*. We have analyzed the cases which recognize the rescue doctrine, and, without doubting Bailey's sincerity in wanting to locate Michael we are of the opinion that the defendant's interpretation of this issue is more accurate than the argument of the People.

The fifth amendment rescue doctrine originated in California in 1965. In effect, it holds that

> "where the interrogation of a suspect is undertaken by the police for the paramount reason that information is being sought to save a life, the interrogating officers are justified in not impeding their rescue efforts by informing the defendant of his rights to remain silent and to the assistance of counsel, as would otherwise be required. under [*Miranda*]. The rationale behind the doctrine is that the interest in saving a human life is

considered to be outside of the parameters of the constitutional protection afforded against self-incrimination."

Annot., 9 A.L.R. 4th 595, 596 (1981). The rescue idea is similar to the fourth amendment "exigent circumstances" doctrine, *see Wayne v. United States,* 318 F.2d 205 (D.C. Cir.1963); *People v. Clements,* 661 P.2d 267 (Colo.1983); *McCall v. People,* 623 P.2d 397 (Colo.1981), in that an overriding concern for the life of a victim excuses police conduct that, apart from the emergency, would be improper or illegal. To date, California appears to be the only jurisdiction which has explicitly embraced the rescue doctrine as an exception to fifth amendment violations. *See Whitfield v. State,* 287 Md. 124, 133 n. 5, 411 A.2d 415, 421 n. 5 (1980).

In *People v. Modesto,* 62 Cal.2d 436, 398 P.2d 753, 42 Cal.Rptr. 417 (1965), *later appeal,* 66 Cal.2d 695, 427 P.2d 788, 59 Cal. Rptr. 124 (1967), *cert. denied,* 389 U.S. 1009, 88 S.Ct. 574, 19 L.Ed.2d 608 (1967), the California Supreme Court held that incriminating statements made by a murder suspect were admissible even though the questioning occurred in the absence of defendant's counsel. The parents of two young girls had returned home to find one daughter dead and the other missing. Police officers arrested the defendant thirty minutes

later and questioned him several times during the next eighteen hours about the missing girl. They "suggested" that she might still be alive and that, if the defendant cooperated, they might be able to save her. The defendant finally confessed that the girl was dead. In a pre-*Miranda* opinion,[11] the California Supreme Court determined that the conduct of the police was excusable, since the incriminating statements

"were freely and voluntarily made at a time when the officers were concerned primarily with the possibility of saving [the missing girl's] life. The paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel. . . . In the present case the officers' investigatory and rescue operations were necessarily inextricably interwoven until [the missing girl's] body was found, and it would be needlessly restrictive to exclude any evidence lawfully obtained during the rescue operations."

*Id.* at 446–47, 398 P.2d at 759, 42 Cal.Rptr. at 423.[12]

Recently, the California Court of Appeal devised a list of criteria for application of

**11.** The court distinguished *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), in which the United States Supreme Court held that incriminating statements obtained "surreptitiously" after the defendant's release on bail were inadmissible. The court noted that, although the police investigation in *Massiah* was ongoing, there was "no compelling emergency . . . . Under these circumstances, we do not believe that the *Massiah* case is controlling." 62 Cal.2d at 446–47, 398 P.2d at 759, 42 Cal.Rptr. at 423.

**12.** The California Court of Appeal amplified the *Modesto* principle in *People v. Dean,* 39 Cal. App.3d 875, 114 Cal.Rptr. 555 (1974). In that case, the police arrested a kidnapper as he waited for the ransom delivery. "[O]ut of concern for the whereabouts and safety of the kidnap victim, [they immediately] asked the defendant where she was," and he confessed to the crime. The court of appeal stressed that "[n]o promises or threats were made to defendant to elicit this information," that "the questioning was spontaneous upon apprehending

defendant," and that the agents' "sole motivation [was] to rescue the victim." *Id.* at 880, 884–85, 114 Cal.Rptr. at 557, 561. The court then confronted the issue of whether the rule in *Modesto* survived *Miranda* and decided that it did:

"It would seem to this court that even more basic than the right of a citizen not to be compelled to incriminate himself is the right of a citizen to his *life* . . . . While life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent. It is inconceivable that the *Miranda* court or the framers of the Constitution envisioned such admonishments first be given under the facts presented to us. While we do not countenance the rubber hose to obtain the answers, we see no wrong in asking the type of questions found herein . . . . The kidnapper must be stopped and the victim saved. This is the thrust of the *Modesto* decision which we believe to be still fully vital law."

*Id.* at 883–84, 114 Cal.Rptr. at 559–60 (emphasis in original).

the rescue doctrine. In *People v. Riddle,* 83 Cal.App.3d 563, 148 Cal.Rptr. 170 (1978), *cert. denied,* 440 U.S. 937, 99 S.Ct. 1283, 59 L.Ed.2d 496 (1979), a husband reported to police that someone had ransacked his house and abducted his pregnant wife. Police officers arrested the defendant six hours later and questioned him repeatedly during the next thirty-six hours. At one of the interviews, a police officer failed to "Mirandize" the defendant "because he felt that urgency of time required immediate discovery of [the missing victim]." *Id.* at 569, 148 Cal.Rptr. at 172. He asked but two questions before the defendant confessed that the victim was dead.

In its opinion, the court of appeal invoked the *Modesto* analysis. It concluded that emergency circumstances—"when time is of the essence"—represent an exception to *Miranda,* applicable only "in instances of overriding need to save human life or to rescue persons whose lives are in danger." *Id.* at 575, 148 Cal.Rptr. at 176. It listed three elements which, in its view, must be present before an emergency situation exists:

> "Urgency of need in that no other course of action promises relief;
>
> The possibility of saving human life by rescuing a person whose life is in danger;
>
> Rescue as the primary purpose and motive of the interrogators."

*Id.* at 577, 148 Cal.Rptr. at 177.

Each of these elements was present in *Riddle,* and, as a result, the court of appeal held that the defendant's statements were admissible in spite of the failure to give a *Miranda* advisement. The court emphasized that the police had no information to suggest that the victim was not alive. The critical interview took place eleven hours after the reported disappearance, at a time when "the possibility of rescue still seemed realistic." Under the circumstances, "it was still reasonable to hope [the victim] might be alive." [13] In addition, the primary motive of the police was to locate and rescue the victim. This rescue motive, according to the court,

> "controls the secondary motive of criminal investigation until such time as the primary motive has ceased to be realistic. [Consequently], under circumstances of extreme emergency where the possibility of saving the life of a missing victim exists, non-coercive questions may be asked of a material witness in custody, even though answers to the questions may incriminate the witness."

*Id.* at 579, 148 Cal.Rptr. at 179.

After reviewing these cases [14] and the arguments presented by the parties in this appeal, we find it unnecessary to decide whether the rescue doctrine should be adopted as the law of this state. The reason we need not decide the issue here is because the record before us does not establish the factual underpinnings of the doctrine. More than three months had passed since Michael Manning's disappearance. While the police were rightfully concerned about his well-being, their long-standing concern was simply not the same as the sense of urgency that permeated police activities in *Modesto* and *Riddle.* In those cases, time was of the essence, as it perhaps would have been here if the evidence of severe child abuse had surfaced within hours or even days after Michael's disappearance. Instead, the investigation dragged on with no solid clues until early April. At that point, it stalled completely,

13. "Only a few hours had elapsed since the discovery of the crime, and it was still feasible to hope that [the victim] might be lying somewhere, unattended, but still alive." 83 Cal. App.3d at 578, 148 Cal.Rptr. at 178.

14. *See also People v. Miller,* 71 Cal.2d 459, 455 P.2d 377, 78 Cal.Rptr. 449 (1969), *cert. denied,* 406 U.S. 971, 92 S.Ct. 2417, 32 L.Ed.2d 672 (1972) (police officer's paramount interest was to locate and rescue missing child); *People v. Jacobson,* 63 Cal.2d 319, 405 P.2d 555, 46 Cal. Rptr. 515 (1965), *cert. denied,* 384 U.S. 1015, 86 S.Ct. 1954, 16 L.Ed.2d 1036 (1966) (privilege of police at investigatory stage to ask questions which might be necessary to save a life took precedence over duty to advise suspect of right to remain silent); *People v. Willis,* 104 Cal. App.3d 433, 163 Cal.Rptr. 718 (1980), *cert. denied,* 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980) (applied the criteria discussed in *Riddle;* case involved child missing for sixteen hours).

and the decision was made to close the case within one or two weeks. When Bailey learned of Tricia Manning's testimony, he began actively to search for Michael's body. Hoping for the best, he nevertheless had to realize that the passage of time, the investigative dead-end, and the accumulation of evidence and rumor pointed to the conclusion that Michael was already dead.

Furthermore, the source of Bailey's fear and frustration when he interviewed Manning on April 8 and 9 appears different than the source of the urgency in *Modesto* and *Riddle.* Bailey knew that Manning was about to be released on bond. He sensed that unless Manning decided to talk about Michael then, the truth about her son might never be revealed. While Bailey wanted to "rescue" Michael if possible, the sudden "urgency" that gripped him stemmed primarily from his intuitive realization that, just as he was about to break open the investigation, Manning was about to go free. To complicate matters, Manning initiated the crucial conversation of April 9 by attempting unsuccessfully to trade information for the release of her friends. When her attempt failed, she withdrew into the fetal position that Bailey had seen before. As the final opportunity to learn about Michael seemingly slipped away, Bailey decided to promise Manning that she would not be prosecuted for any crimes she might admit during the course of the interview. The promise did not amount to "spontaneous" and "noncoercive" questioning of a suspect during a life-threatening emergency. It was part of a desperate but calculated bargain offered by Bailey and accepted by Manning. We conclude that Bailey's promise, which was subsequently renewed and which elicited the incriminating statements on April 9 and 10, 1983, cannot be excused under the fifth amendment rescue doctrine. *See Riddle,* 83 Cal.App.3d 563, 148 Cal.Rptr. 170 (1978), *cert. denied,* 440 U.S. 937, 99 S.Ct. 1283, 59 L.Ed.2d 496 (1979); *People v. Dean,* 39 Cal.App.3d 875, 114 Cal.Rptr. 555 (1974).

### D. The Appropriate Remedy

■ In cases such as this involving reasonable and detrimental reliance upon a governmental promise, the question of remedy turns ultimately on what type of relief will accord the defendant substantial justice. We recognized as much in *Fisher* when we held that the defendant was entitled to specific performance of the governmental promise, upon which he reasonably and detrimentally relied in furnishing incriminating information to the police, because there was no other remedy available to the court that could approximate substantial justice under the circumstances of the case. When, however, in contrast to *Fisher,* other remedies are available, then the court should exercise a reasonable discretion in fashioning a form of relief that can secure substantial justice to the defendant and at the same time accommodate the legitimate interests of the government. Fashioning an appropriate remedy to the necessities of a particular case has been the essence of equity jurisdiction, where flexibility rather than rigidity has been the hallmark. *See, e.g., Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Dlug v. Wooldridge,* 189 Colo. 164, 167, 538 P.2d 883, 885 (1975). The issue of remedy becomes pertinent only after the defendant has established a due process entitlement to some form of judicial relief by reason of certain actions taken in reasonable and detrimental reliance on a governmental promise.

■ Because Manning furnished information to the police after a promise was made, a remedy that accords substantial justice to her is to treat her statements as if they had been obtained pursuant to a grant of use-immunity. "Use immunity ... is a grant with limitations. Rather than barring a subsequent related prosecution, it acts only to suppress, in any such prosecution, the witness' testimony and evidence derived directly or indirectly from that testimony." *Steinberger v. District Court,* 198 Colo. 59, 62, 596 P.2d 755, 757 (1979) (quoting *Wheeler v. District Court,* 184 Colo. 193, 199, 519 P.2d 327, 331 (1974)). Use-immunity is coextensive with the defendant's privilege against self-incrimination and, when

granted, leaves an accused in substantially the same position as if she had not relinquished her constitutional rights at all. *Pillsbury Co. v. Conboy,* —— U.S. ——, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

■ Given the scope of Bailey's implied promise and Manning's reasonable and detrimental reliance on his promise, use-immunity adequately protects Manning's interest in vindicating any constitutional rights which she relinquished in her statements to Bailey. The trial court's suppression order, however, went far beyond use-immunity by suppressing all evidence gathered in the police investigation prior to the time Bailey made his promise on April 9, 1983. This evidence was legitimately and independently acquired by the police prior to any governmental promise and, as such, should not have been suppressed. Manning's statements to the police between April 9 and April 22, 1983, however, must be suppressed under the use-immunity principle, as well as any evidence derived directly or indirectly from Manning's statements. *See Pillsbury Co.,* —— U.S. ——, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983); *United States v. Apfelbaum,* 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980); *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979).

The Ruling and Order of the trial court is affirmed in part and reversed in part, and the case is remanded for further proceedings.

NEIGHBORS, J., does not participate.